**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

MASSACHUSETTS FAIR HOUSING
CENTER; INTERMOUNTAIN FAIR
HOUSING COUNCIL; SAN ANTONIO
FAIR HOUSING COUNCIL, INC., d/b/a
FAIR HOUSING COUNCIL OF SOUTH
TEXAS; and HOUSING RESEARCH AND
ADVOCACY CENTER d/b/a FAIR
HOUSING CENTER FOR RIGHTS &
RESEARCH, INC., *on behalf of themselves*
*and all those similarly situated,*

        Plaintiffs,

v.

THE DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT; SCOTT
TURNER, *in his official capacity as Secretary*
*of Housing and Urban Development*; U.S.
DOGE SERVICE; U.S. DOGE SERVICE
TEMPORARY ORGANIZATION; and AMY
GLEASON, *in her official capacity as Acting*
*Administrator of U.S. DOGE Service and U.S.*
*DOGE Service Temporary Organization*,

        Defendants.

Civil Action No. 3:25-cv-30041

**CLASS ACTION COMPLAINT**

---

**INTRODUCTION**

1.    In 1968, Congress adopted the Fair Housing Act (FHA) to enshrine a policy of the

"highest priority": to provide for fair housing throughout the United States. Over the last five and

a half decades, one of the primary shepherds of this priority policy has been the network of fair

housing organizations guarding against housing discrimination and advancing equal housing

opportunities in every state of the Union.

2.     On February 27, 2025, the U.S. Department of Housing and Urban Development (HUD) arbitrarily and without notice, reason, or sensible explanation terminated 78 Fair Housing Initiatives Program (FHIP) grants, a primary source of funding for fair housing organizations in 33 states. The advocacy, enforcement, education and outreach, counseling, and training that has been a bulwark against housing discrimination and segregation for decades was immediately and suddenly compromised.

3.     The FHIP grants program originated from Congress's recognition of the central role of fair housing organizations in combatting housing discrimination and was designed to help those organizations accomplish their critical fair housing missions. Every year since the program was created, Congress has appropriated tens of millions to the program, and HUD has provided those funds to organizations that have used the money to identify and counteract various forms of housing discrimination, counsel people seeking housing, educate the public about the fair housing law, and enforce the nation's fair housing protections. As HUD has managed the program over the years, it has enshrined the FHA's statutory priorities in regulations and grant-related documents, and it has carefully monitored fair housing groups' efforts to achieve those priorities.

4.     The Named Plaintiffs and the class of organizations they represent have all used FHIP grants to ensure that individuals and families in the communities they serve can find and maintain safe, affordable, and accessible housing free from discrimination. The summary cancellation of their FHIP grants has caused an immediate and devasting impact. They have had to shutter programs, terminate services, lay off staff members, and shrink their core activities. Some face the likelihood of near-term closure.

5.      The effects on the organizations have dire consequences for the communities they serve. Many class members operate in states where no other organization engages in such work, and many serve communities that are often overlooked and underserved: rural areas, low-income neighborhoods, immigrant groups, veterans, and people with disabilities. This will have a wide range of impacts, from leaving elderly people who cannot navigate the steps into their apartments with no one to call, to forcing people facing eviction to stand up in court alone, uncertain of their rights, to sending families illegally excluded from housing into homelessness.

6.      The class members' efforts are massive in scale and personal in effect: collectively the class members assist tens of thousands of people each year experiencing housing discrimination, and that assistance can mean the difference between a family having an equal opportunity to live in the home of their choice and being constrained to substandard, inaccessible, or overcrowded housing.

7.      The inexplicable, unexpected, and abrupt cancellation of FHIP grants at 66 organizations came through a form letter explaining that HUD was terminating the grants "at the direction of [the] Department of Government Efficiency" (DOGE), "pursuant to" the executive order establishing that body. HUD then said the grants were being terminated because they "no longer effectuate[] the program goals or agency priorities."

8.      Neither reason makes any sense. In the FHA, Congress explained the purposes of FHIP grants: they exist to expand enforcement of the FHA by enabling fair housing groups to identify and remedy "discrimination in public and private real estate markets and real estate-related transactions," develop ways of "respond[ing] to new or sophisticated forms of discrimination," bring enforcement capacity to underserved areas of the country, and conduct education and outreach to tell people that the FHA exists, that they must follow it, and that it

3

protects them. 42 U.S.C. § 3616a. The plaintiffs' activities under these grants effectuate those exact purposes.

9.     Moreover, DOGE has no authority to direct HUD to cancel grants, nor does HUD have any authority for accepting DOGE's grant-related directives.

10.    The impact of this sudden loss of funding to the class members has been immediate and severe for the organizations, their communities, and the principle of fair housing that has been a guiding light for the nation's policies since 1968. Housing discrimination continues while DOGE and HUD pull the plug on a primary statutory means of redressing it.

11.    The mass termination of millions of dollars of FHIP grants, representing a significant portion of total FHIP funding for 2025 and affecting 33 states across the country, was an arbitrary, capricious, and unlawful action by HUD and an *ultra vires* action by DOGE. In this case, brought on behalf of themselves and a class of similarly situated fair housing groups, the Named Plaintiffs seek to reverse the termination through the injunctive relief of reinstating the grants.

## JURISDICTION AND VENUE

12.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1361, 5 U.S.C. § 702, and 28 U.S.C. § 2201.

13.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to the claims occurred within this District.

## PARTIES

14.    Plaintiff Massachusetts Fair Housing Center ("MFHC") is the oldest fair housing center in Massachusetts. A non-profit organization with its principal place of business in Holyoke, Massachusetts, it serves Berkshire, Hampden, Hampshire, Franklin and Worcester

Counties. For more than 35 years, MFHC has worked to eliminate housing discrimination and promote equal access to housing through community legal education and outreach, housing mobility counseling, civil rights investigations, individual legal representation, impact litigation, and public policy advocacy. MFHC is in the second year of a multi-year FHIP grant of $1,275,000 that was unlawfully terminated; when it was terminated, MFHC was slated to receive another $212,500 this year, plus an additional $425,000 next year.

15.    Plaintiff Intermountain Fair Housing Council ("IFHC") is a non-profit fair housing organization with its principal place of business in Boise, Idaho. It has served the state of Idaho for over thirty years. IFHC aims to ensure open and inclusive housing by counseling clients on housing options, referring them to potential housing, educating them on rights under the fair housing laws and helping them resolve discrimination disputes or file complaints; providing eviction defense services; offering education and outreach to housing providers and their agents; and engaging in large-scale investigations of discriminatory housing practices, including through testing. IFHC received three FHIP grants that were unlawfully terminated, which collectively amount to approximately $509,000. At the time of termination, IFHC was slated to receive another approximately $120,000 under the grants.

16.    Plaintiff San Antonio Fair Housing Council, Inc., d/b/a Fair Housing Council of South Texas ("FHCST"), is a non-profit fair housing organization with its principal place of business in San Antonio, Texas. Since its founding in 1996, FHCST has promoted fair housing through complaint investigation, testing, counseling services, advocacy, mediation efforts, enforcement actions, outreach activities, and educational trainings. FHCST is in the first year of a multi-year FHIP grant of $1,275,000 that was unlawfully terminated; when it was terminated,

FHCST was slated to receive another $212,500 under the grant this year, plus an additional $850,000 under the grant in future years.

17.    Plaintiff Housing Research and Advocacy Center, d/b/a Fair Housing Center for Rights and Research ("HRAC"), is a non-profit fair housing organization with its principal place of business in Cleveland, Ohio. Since 1994, it has aimed to ensure, through research, educational programs, public policy advocacy, and enforcement activities, that all residents are guaranteed equal access to housing. HRAC received two FHIP grants, which together amount to approximately $225,000. The grants were unlawfully terminated, and at the time of termination, HRAC was slated to receive another $112,500 under the grants.

18.    Defendant U.S. Department of Housing and Urban Development ("HUD") is an executive branch agency of the United States government. It is charged with administering a variety of federal housing programs, including the Fair Housing Initiative Program grants at issue in this Complaint.

19.    Defendant Scott Turner is sued in his official capacity as the Secretary of HUD.

20.    Defendant U.S. DOGE Service (previously the U.S. Digital Service) is a federal entity established in the Executive Office of the President. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

21.    Defendant U.S. DOGE Service Temporary Organization is a federal temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator. *Id.* Together Defendant U.S. DOGE Service and U.S. DOGE Service Temporary Organization will be referred to as "DOGE."

22.    Defendant Amy Gleason is sued in her official capacity as the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

**FACTUAL BACKGROUND**

**Enactment and Provisions of the FHIP Statute, 42 U.S.C. 3616a**

23.     Since the FHA was passed in 1968, non-profit organizations devoted to fair housing have played a pivotal role in making the statute's protections real. Around the country, these fair housing groups have educated property owners, real estate companies, and the public about fair housing; counseled clients looking to secure safe housing free from discrimination; conducted investigations to identify misconduct; and filed court actions to enforce the fair housing laws.

24.     During the 1970s and 1980s, they endeavored to do so with minimal resources. The House Report on the Fair Housing Amendments Act of 1988 noted that "fair housing organizations are burdened with primary enforcement responsibility" for the FHA, H.R. Rep. No. 711, 100th Cong., 2d Sess 15-16, *reprinted in* 1988 U.S. Code Cong. Admin. News 2173, 2176-77 (footnotes omitted), but they lacked sufficient resources to carry this burden.

25.     Beginning in 1987, fair housing groups worked with HUD to develop a program that would provide direct funding to qualified, private nonprofit fair housing agencies to conduct fair housing education programs and to provide intake, testing, investigation, conciliation, and/or litigation of verified complaints of housing discrimination to increase the effectiveness of the FHA. With support from the Reagan administration and leadership from the House and Senate, Congress approved a $3 million pilot program called the Fair Housing Initiatives Program (FHIP) in the Housing and Community Development Act of 1987. The initial two-year program was extended for two more years in 1990, and in 1991, the General Accounting Office reported that the program was succeeding.

26.    Recognizing "the proven efficacy of" fair housing organizations that were serving as "a necessary component of the fair housing enforcement system," P.L. 102-550, § 905(a)(9), Congress amended the FHA to provide support for these organizations. It did so through the Housing and Community Development Act of 1992, 42 U.S.C. § 3616a, which made FHIP permanent and authorized FHIP funds to implement testing programs; establish new fair housing organizations or expand capacity of existing ones; conduct special projects to respond to new or sophisticated forms of housing discrimination; undertake larger, long-term enforcement activities through multiyear funding agreements; and pay for litigation. *See* 42 U.S.C. § 3616a.

27.    Since the passage of the FHIP statute, fair housing groups have continued to be critical to enforcing fair housing laws, as the government's studies have shown. The U.S. Government Accountability Office noted the effectiveness of the fair housing organization model in a comprehensive analysis of FHIP in 1997,[1] and in 2011, a HUD study concluded that FHIP grantee organizations added enormous value to the agency:

> When FHIP grantee organizations are the first point of contact for a complainant, the organization adds value in two ways: First, FHIP grantee organizations weed out cases that are not covered by civil rights statutes, as well as those cases in which the organization's investigations show a complaint lacks merit. This vetting saves resources for HUD and state agencies that do not have to investigate these cases. Second, the investigative evidence provided to HUD and state agencies for a complaint on which a FHIP grantee organization has signed on as a complainant or representative adds merit to those cases. These are the cases that are much more likely to end in a conciliation or cause finding than are other cases in which the complainant comes directly to HUD and state agencies. Of particularly high value is testing evidence, which is limited almost exclusively to the cases that involve a FHIP grantee organization.[2]

---

[1] Government Accounting Office, Letter Report, March 3, 1997, *Fair Housing: Funding and Activities Under the Fair Housing Initiatives Program*, available at https://www.govinfo.gov/content/pkg/GAOREPORTS-RCED-97-67/html/GAOREPORTS-RCED-97-67.htm.

[2] U.S. Department of Housing and Urban Development, Office of Policy Development and Research, *Study of the Fair Housing Initiatives Program* (2011), at iii, available at https://www.huduser.gov/publications/pdf/fhip_2011.pdf.

28.    To the extent Congress has appropriated funds, the FHIP statute requires HUD to provide grant funding to fair housing organizations to carry out anti-discrimination activities in three sections: (1) "Private enforcement initiatives," (2) "Funding of fair housing organizations," and (3) "Education and outreach."[3]

29.    The statute is clear that the purpose of these grants is to effectuate the anti-discrimination provisions of the FHA.

30.    With respect to "private enforcement initiatives," the statute provides that "[t]he Secretary shall use funds made available under this subsection to conduct, through contracts with private nonprofit fair housing enforcement organizations, investigations of violations of the rights granted under [the FHA], and such enforcement activities as appropriate to remedy such violations." 42 U.S.C. § 3616a(b)(1).  Specifically, the Secretary shall use funds "to conduct, through contracts with private nonprofit fair housing enforcement organizations, a range of investigation and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination" that violate the FHA. *Id.* at (b)(2). These investigation and enforcement activities include testing, technical assistance to local fair housing organizations, and funding for litigation costs.

31.    Under the "Funding of fair housing organizations" directive, the statute instructs the Secretary to "use funds made available under this section to enter into contracts or

---

[3] The FHIP awards are "grant agreements" under federal law because their principal purpose is carry out a public purpose authorized by law, rather than to acquire property or services for the "direct benefit or use of the United States Government." 31 U.S.C. § 6304.

cooperative agreements with qualified fair housing enforcement organizations, other private nonprofit fair housing enforcement organizations, and nonprofit groups" to build existing organizations' capacity to enforce rights under the FHA, 42 U.S.C. § 3616a(c)(1); it also instructs the Secretary to use funds to "help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected classes exist." *Id.* at (c)(2).

32.    With respect to education and outreach, the statute provides that the Secretary "shall" use funds to contract with fair housing groups to conduct education and outreach to "prevent or eliminate discriminatory housing practices." *See id.* at (d)(1)–(3) (the Secretary "shall establish a national education and outreach program," "shall establish or support education and outreach programs at the regional and local levels," and "shall provide funding to . . . support community-based education and outreach activities." *Id.*

33.    Since it amended the FHA to provide for FHIP grants, Congress has appropriated funds to HUD to administer the program for each fiscal year using similar appropriations language.

34.    In the Consolidated Appropriations Act for 2024, Congress appropriated $86,355,000 for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 et seq.) and section 561 of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a)," Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 370. Congress made similar appropriations for the same purposes in 2023 and 2022. *See* Consolidated Appropriations Act,

2022, Pub. L. No. 117-103, 136 Stat. 750 ($85,000,000 for these purposes); Consolidated

Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 5166 ($86,355,000 for these purposes).

**HUD's FHIP Regulations**

35.    HUD promulgated regulations to implement the FHIP initiatives created by

42 U.S.C. § 3616a. These regulations appear at 24 C.F.R. § 125 *et seq.* and include regulations

governing FHIP's Private Enforcement Initiative ("PEI"), Fair Housing Organizations Initiative

("FHOI"), and Education and Outreach Initiative ("EOI").

36.    The PEI "provides funding . . . to investigate violations and obtain enforcement of

the rights granted under the Fair Housing Act . . . ." 24 C.F.R. § 125.401(a). The PEI carries out

Congress's mandate that HUD "shall use funds" for these activities. 42 U.S.C. § 3616a(b)(1)-(2).

37.    The FHOI "provides funding to develop or expand the ability of existing eligible

organizations to provide fair housing enforcement, and to establish . . . new fair housing

enforcement organizations." 24 C.F.R. § 125.501(a). The FHOI carries out the Congressional

mandate that HUD "shall use funds" to establish and build capacity in fair housing organizations

to enforce the rights granted under the FHA. 42 U.S.C. § 3616a(c)(1)-(2).

38.    The EOI "provides funding [to support] education and outreach programs

designed to inform members of the public concerning their rights and obligations under the

provisions of fair housing laws." 24 C.F.R. § 125.301(a). Within the EOI, organizations may

apply for three types of grants: national, regional and/or local, and community-based. The EOI

carries out Congress's mandates that HUD shall provide funding for education and outreach "to

prevent or eliminate discriminatory housing practices," 42 U.S.C. § 3616a(d).

39.    The regulation also mandates that the HUD publish periodic notices, which set

forth basic information about the awards, such as the available amounts, eligible applicants and

activities, and selection criteria. § 125.104(d). These periodic notices are called Notices of

Funding Opportunity ("NOFO"). For each fiscal year that funding is available, HUD publishes a

NOFO for each FHIP program and, if applicable, for each type of grant within each FHIP

program.

**The Terms and Conditions of the Federal Award**

40.    After HUD publishes a NOFO, organizations apply for funds. HUD conducts an

initial screening to set aside ineligible applicants, and applicants meeting the minimum eligibility

requirements move forward to panel review. A HUD panel reviews and scores these applications

in accordance with the NOFO rating factors. It then selects applications and secures internal

approvals of its selections. When the applicants are selected, HUD issues grant agreements and

notices of awards to recipients. HUD and the applicants together execute the notice of award,

and the grantee then begins work under the grant, subject to periodic review and reporting. *See*

HUD Exchange, *Grants Management Lifecycle*, *available at*

https://www.hudexchange.info/sites/onecpd/assets/Image/Grants-Management-Lifecycle-

HUD.jpg.

41.    For each FHIP grant, the "grant agreement," or the instrument containing the

terms and conditions of the award, is HUD's Form HUD-1044 and its attachments. The HUD-

1044 is a standard form one-page document that sets forth key details such as the amount of the

grant, period of performance, and grant expiration date. Each HUD-1044 also incorporates

several standard form attachments that contain additional grant terms and conditions, described

below.

a.    *Attachment A* is a document called the Schedule of Articles, which sets

forth the terms and conditions of the grant agreement in more detail. Attachment A incorporates

by reference 2 CFR Part 200 *et seq.* and describes conditions and regulations on topics such as amendment of the grant, method of payment, and data collection. Attachment A makes clear that the funds are to be used exclusively for the approved purposes.

      b.    *Attachment B* is a document called the Addendum to the Schedule of Articles, which sets forth additional terms and conditions. Attachment B describes several provisions governing termination for failure to comply with the grant's terms and conditions: It permits termination based on the grantee's failure to make reasonable efforts to complete project activities; permits termination based on alleged violations of the FHIP statute or other applicable law following a third-party complaint, permits termination based on a "Poor" performance rating under some circumstances; and permits termination based on failure to comply with financial monitoring and reporting requirements.

      c.    *Attachment C* is a document setting forth any special conditions to a grant, such as if HUD requires the grantee to list indirect cost items in its budget.

      d.    *Attachment D* is a document called Grantee Declarations Form, in which the grantee guarantees it will follow certain rules regarding staff salaries, costs, and travel reimbursements.

      e.    *Attachment E* is a document called Additional Assurances, in which the grantee certifies that it will comply with various other federal statutes and regulations, such as by making all materials accessible to people with disabilities.

      f.    *Attachment F* is a document called Statement of Work, in which the grantee describes the activities it will undertake in more detail.

      g.    *Attachment G* is a document called Payment Schedule. It presents a timeline for the grantee's performance and payment within the performance period.

h.    *Attachment H* is a document called Additional Assurances and Certifications. It sets forth additional federal statutes that the grantee must comply with, including the Fair Housing Act.

**The FHIP Program Goals and HUD Agency Priorities Furthered by FHIP Grants**

42.    OMB directs that before issuing a NOFO, each agency "must design a program and create an Assistance Listing" outlining the program goals. 2 C.F.R. § 200.202.

43.    The Assistance Listings for PEI, EOI, and FHOI grants specify that the program goals for each program are the same as the statutory goals embodied in the FHA.

44.    For PEI grants, the objectives are "[t]o assist private non-profit fair housing enforcement organizations in the investigation and enforcement of violations of the rights granted under title VIII of the Civil Rights Act of 1968 (42 U.S.C. 2801)," and "[t]o develop, implement, and carry out, related activities and enforcement under the Fair Housing Act or State or local laws that provide substantially equivalent rights and remedies for alleged discriminatory housing practices. Objectives include carrying out testing and other investigative activities." FHIP PEI Assistance Listing Number 14.418.

45.    For FHOI grants, the objective is "[t]o assist organizations that are regional and local, community based and National programs, that develop, implement, carry out, or coordinate programs and/or activities to educate the public about their rights under, the Fair Housing Act (42 U.S.C. 3601-3619) or about State or local laws that provide substantially equivalent rights and remedies for alleged discriminatory housing practices." FHIP FHOI Assistance Listing Number 14.417.

46.    For EOI grants, the objective is "[t]o assist organizations that are regional and local, community based and National programs, that develop, implement, carry out, or

14

coordinate programs and/or activities to educate the public about their rights under, the Fair
Housing Act (42 U.S.C. 3601-3619) or about State or local laws that provide substantially
equivalent rights and remedies for alleged discriminatory housing practices." FHIP EOI
Assistance Listing Number 14.416.

47.     These express statements in the Assistance Listings capture the FHIP program
goals and HUD agency priorities that are outlined in the statute, 42 U.S.C. § 3616a, which
establishes the purposes of the program and the nature of the activities HUD is directed to
undertake using congressionally authorized funds. *See, e.g.*, 24 C.F.R. § 125.301(a), 401(a),
501(a).

48.     The program goals and agency priorities are also reflected in the NOFOs that
HUD puts out for each grant cycle when it has completed the Assistance Listings. Each NOFO
must include selection criteria that "promote the purposes of the FHIP in an equitable and cost
efficient manner." 24 C.F.R. § 125.104(d). Indeed, each of the NOFOs associated with the
Plaintiffs' terminated grants here reiterate and reinforce the statutory and regulatory purposes of
FHIP grants. Each notes that FHIP is designed to support enforcement, education, and outreach
activities, and that such activities are designed to prevent or eliminate discriminatory housing
practices prohibited by the FHA and to inform individuals of their rights and responsibilities
under the FHA.

**The Department of Government Efficiency**

49.     On November 12, 2024, then President-Elect Trump announced his intent to
create the "Department of Government Efficiency" ("DOGE") to "provide advice and guidance
from outside of Government" to "the White House and Office of Management & Budget."

50.     On the day of his inauguration, January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," ("the E.O."), reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President.

51.     The E.O. does the following, none of which relate in any way to FHIP:

- Establishes the role of U.S. DOGE Service Administrator in the Executive Office of the President, reporting to the White House Chief of Staff, and establishes within U.S. DOGE Service a temporary organization known as "the U.S. DOGE Service Temporary Organization." The U.S. DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing "the President's 18-month DOGE agenda."

- Requires each agency head to establish a "DOGE Team" comprised of at least four employees within their respective agencies. DOGE Teams are required to "coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda."

- Directs agency heads to take all necessary steps "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," but makes no mention of this directive being subject to applicable law.

52.     Critically, the E.O. does not vest any statutory authority in DOGE. DOGE officials have asserted that DOGE "falls under the Presidential Records Act," and so is "a unit or individual of the Executive Office of the President whose function is to advise or assist the President," in "carrying out of the constitutional, statutory, or other official or ceremonial duties

of the President." 44 U.S.C. § 2201. DOGE is not an agency and has no authority to direct any agency to do anything.

53.    The E.O. does not mention HUD or FHIP in any way; instead, it concerns software systems and similar elements completely unrelated to FHIP.

**Defendants Cut Off Millions in Funds that Congress Appropriated for FHIP Grants**

54.    On February 27, 2025, HUD sent a form Termination Notice cancelling funding for 78 FHIP grants. Each class member received one or more form Termination Notices regarding a FHIP grant the organization had been awarded. Each notice states that HUD would be terminating the award effective that same day, February 27, 2025. Each notice states that "all obligations and activities under the grant number . . . will cease" as of February 27, 2025.

55.    Each notice is identical, stating that the action was being taken at the direction of the President pursuant to the President's Executive Order ("E.O.") 14158, "Establishing and Implementing the President's 'Department of Government Efficiency.'"

56.     Each form Termination Notice states that the award is being terminated "because it no longer effectuates the program goals or agency priorities." The Termination Notice does not refer to the FHIP statute, the implementing regulations, or any specific program goals or agency priorities, nor does it explain how the organizations' activities fail to effectuate them. No Termination Notice offers the grantee any advance notice or opportunity to correct any deficiency. No Termination Notice cites any of the terms and conditions of the awards, or any violation thereof.

57.    The E.O. does not refer to HUD, FHIP, any specific program goals or agency priorities, or grant termination of any kind.

58.     Each notice also states that it is being issued at the direction of DOGE, according to 2 CFR 200 subpart D.

**Regulations Governing Grant Termination**

59.     The termination of these FHIP grants is governed by regulations promulgated by the Office of Management and Budget (OMB), which apply to HUD, and which do not permit agencies to carry out terminations in the way that HUD has done here.

60.     A grant may be terminated by HUD for several reasons Defendants did not rely on: it may be terminated if the recipient fails to comply with the terms and conditions of the award, 2 C.F.R. § 200.340(a)(1), in which case the agency must publicly report the termination, 2 C.F.R. § 200.340(c), or it may be terminated with the consent of the recipient, or by the recipient. 2 C.F.R. § 200.340(a)(2)-(3).

61.     While a grant may be terminated where it "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), this is not a carte blanche; an agency making a final determination to cancel an award must explain the reasons for its decision, consistent with the law governing final agency action. *See, e.g.*, 5 U.S.C. § 706(2)(A), *Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). Nothing in the OMB or HUD regulations exempts HUD from this requirement.

62.     Here Plaintiffs' work furthered the statutorily mandated program goals and agency priorities and there is no basis to find the contrary as Plaintiffs' activities track the statutory purposes, implementing regulations, and grant documents directly. And Defendants provided no explanation at all for how or why the activities did not further program goals and agency priorities.

63.     Moreover, nothing in the statute, regulations, or any other source of law mentions or permits canceling a FHIP grant at the direction of DOGE or based on any of the topics discussed in the E.O.

**The Named Plaintiffs' Terminated Grants**

### *Massachusetts Fair Housing Center*

64.     MFHC—then called the Housing Discrimination Project—was founded by legal services attorneys and shelter advocates in response to the creation of FHIP, and it received funding in the first round of FHIP awards in late 1989. Today, it aims to eliminate housing discrimination and promote equal access to housing through community legal education and outreach, housing mobility counseling, civil rights investigations, individual legal representation, impact litigation, and public policy advocacy.

65.     MFHC has 9 full-time staff and an annual budget of less than $900,000. It is in its second year of a multi-year PEI grant of $1,275,000, under which it was slated to receive $425,000 this year. Nearly half (47%) of MFHC's annual budget is supported by the PEI grant alone.

66.     Through the PEI grant, MFHC had been providing and would have continued to provide a full range of services to people in FHA-protected groups, including reviewing intakes and investigating complaints; providing advice and representation (including referring meritorious fair housing complaints for enforcement with an administrative agency or in court); building and maintaining its robust testing program and conducting complaint-based, audit, and systemic testing investigations; providing housing placement and counseling; and providing broad outreach and education services to individuals in protected classes as well as to housing providers and professionals.

67.     MFHC was also a subcontractor on an EOI grant, through which it was slated to receive $41,000 this year. As a subcontractor on the EOI grant, MFHC was to engage in outreach, education, and training in both urban and rural areas of Hampden, Hampshire, Berkshire, and Franklin Counties regarding housing discrimination to organizations and individuals, including training to healthcare providers and education for first-time homebuyers.

68.     In reliance on these grants, MFHC hired three staff members in the past year: two attorneys and an outreach coordinator.

69.     MFHC's performance and sound financial management have been rated "very good" or "excellent" by the HUD on all grants closed since 2001. MFHC has never received any communication from HUD that its performance or compliance with the terms and conditions of the terminated grant was anything less than satisfactory.

70.     HUD terminated the FHOI and EOI grants on February 27, 2025, at the direction of DOGE and on the ground that they "no longer effectuate[] the program goals or agency priorities." At the time, the remaining balance of the awards was about $637,500 for the PEI grant (including $212,500 to be paid this year) and $19,000 for the EOI grant.

### The Intermountain Fair Housing Council

71.     The IFHC serves all 44 counties in Idaho, counseling clients on their housing options, referring them to potential housing, educating them on rights under the fair housing laws, and helping them resolve discrimination disputes or file complaints; it provides eviction defense services; it offers education and outreach to housing providers and their agents; and it engages in large-scale investigations of discriminatory housing practices, including through testing.

72.     The IFHC has nine full-time staff and an annual operating budget of less than $1 million, approximately 90% of which comes from HUD funding. The IFHC fulfills the critical purpose identified in § 3616a(c) of providing fair housing enforcement in an area that is underserved by fair housing groups—its Idaho service area includes many rural communities, immigrant communities, and communities with large concentrations of people with disabilities, sometimes because of their age and veteran status. In many places where it works, the IFHC is the only fair housing legal service provider, and to date, it has conducted 50,000 intakes.

73.     Because it serves a community with few fair housing enforcement resources, the IFHC uniquely meets a need for both individual and system-wide services: it is the only non-profit organization currently accepting new clients in eviction cases in its service area, and it receives referrals from legal aid service organizations that are not taking new clients. It is also the only fair housing organization in the state investigating fair housing violations and advocating for relief for people who face housing discrimination.

74.     The IFHC receives a number of HUD grants, including (1) an FHOI grant of $259,000 to implement a full-service fair housing enforcement program designed to address environmental discrimination and algorithmic/alternative intelligence bias; and (2) two EOI grants that together amount to approximately $250,000. Together, these grants paid for the equivalent of four IFHC employees—almost half of the organization's staff.

75.     Pursuant to the FHOI grant, the IFHC was tasked with assisting community members in identifying fair housing matters, conducting intakes, assisting in complaint filing and dispute resolution, training community members, engaging in collaborative consortium meetings, and conducting testing and other systemic investigations, all related to fair housing issues

stemming from environmental discrimination and algorithmic bias (such as tenant screening and home loan products).

76.    Pursuant to the EOI grants, the IFHC was to conduct fair housing education and outreach programming, including creating and distributing resource guides. For example, because of the prevalence of wildfires and other natural disasters in Idaho, the IFHC had been creating a Disaster Planning guide to give information to people with disabilities on evacuation and disaster preparedness. It also provided fair housing trainings in Spanish and American Sign Language.

77.    HUD has repeatedly praised the IFHC for its work; since 2020, it has received exclusively "excellent" grades from HUD for its performance under the grants. Just six months ago, HUD's Principal Deputy Assistant Secretary specifically recognized the IFHC's work on environmental justice and awarded the organization special funding in recognition of this work, along with one of the grants at issue here. The IFHC has never received any communication from HUD that its performance or compliance with the terms and conditions of the grant was anything less than satisfactory.

78.    HUD terminated the FHOI grant and two EOI grants on February 27, 2025, at the direction of DOGE and on the ground that they "no longer effectuate[] the program goals or agency priorities." At the time, the remaining balance of the awards was about $120,000.

### *Fair Housing Council of South Texas*

79.    FHCST has a mission of promoting equitable housing opportunities; engaging in efforts to address discriminatory housing practices; and advocating for open, accessible, and inclusive communities across South Texas. For nearly 30 years, it has furthered this mission

through complaint investigation, testing, counseling services, advocacy, mediation efforts, enforcement actions, outreach activities, and educational trainings.

80.     Prior to the grant terminations, FHCST had four full-time staff, three part-time staff, and three per diem staff. In 2024, FHCST received a $1,275,000, three-year PEI grant, through which it receives $425,000 per year. About 85% of its $500,000 annual operating budget is supported by this grant alone.

81.     The PEI grant covers all aspects of FHCST's work, including its work on behalf of survivors of domestic violence, people with disabilities, people facing eviction because of their membership in FHA-protected classes, and large-scale investigations involving systemic discrimination against FHA-protected groups. Under the grant, FHCST was tasked with providing guidance and counseling on discriminatory housing practices to community members, conducting intakes, assisting in complaint filing and dispute resolution, building and maintaining a robust testing program and conducting complaint-based systemic testing investigations, and providing broad outreach and education services to individuals in protected classes as well as to housing providers and professionals.

82.     In reliance on the PEI grant, FHCST hired three new staff members with a start date of January 22, 2025. Of these new hires, one hire was for a full-time Fair Housing Specialist position, and two hires were for part-time Intake Specialists positions. All new employees supported its core activities of counseling, advocacy, and investigation.

83.     FHCST has received consistent praise from HUD for its work under FHIP grants, literally serving as a model recipient. For years, HUD has given FHCST exclusively "excellent" ratings during its FHIP assessment reviews and often refers staff from other FHIP organizations in its region to contact FHCST to receive guidance on conducting fair housing activities and

grant reporting. As recently as February 5, 2025, FHCST's HUD Government Technical Representative emailed eight organizations in the region requiring them to use the logs that FHCST created to report their grant activities moving forward. FHCST has never received any communication from HUD that its performance or compliance with the terms and conditions of the grant was anything less than satisfactory.

84.     On February 27, 2025, FHCST received a letter that HUD had terminated its PEI grant at the direction of DOGE and on the ground that it "no longer effectuates the program goals or agency priorities." At the time, the remaining balance of the award was $212,500 under the grant this year, plus an additional $850,000 under the grant in future years.

### *Housing Research and Advocacy Center*

85.     HRAC is a Cleveland-based non-profit fair housing organization that since 1994 has engaged in enforcement, education, and programs designed to ensure that all residents are guaranteed equal access to housing. HRAC is the only fair housing organization conducting housing discrimination-related public education in its service area, which includes about 1.5 million people.

86.     HRAC received two EOI grants that together amount to approximately $225,000. Both grants aimed to increase community awareness of fair housing rights and resources among underserved populations and members of protected classes. Under the grants, HRAC was tasked with conducting fair housing trainings, creating and circulating fair housing advertisement and brochures and creating brochures for new residents, and maintaining an online platform for and promoting free fair housing consumer trainings. Some portion of the grants focused on combating source of income discrimination and limited voucher mobility, both of which significantly impact the housing search in the organization's service area; addressing racial

harassment, intimidation, and retaliation; and elevating the impacts of lead exposure, residential asthma triggers, and other environmental factors.

87.     HRAC routinely receives "excellent" ratings from the Department of Housing and Urban Development for its performance on FHIP grants, and it has been widely praised for its innovative and effective fair housing education programs. HRAC has never received any communication from HUD that its performance or compliance with the terms and conditions of the grant was anything less than satisfactory.

88.     On February 27, 2025, HRAC received letters informing it that HUD had terminated both EOI grants at the direction of DOGE and on the ground that they "no longer effectuate[] the program goals or agency priorities." At the time, the remaining balance of the awards was about $112,500.

## INJURIES TO NAMED PLAINTIFFS

89.     As a result of the sudden grant terminations, all plaintiffs are facing immediate, significant impacts on programming. All are forced to shutter work that furthers the purposes of the FHIP statute, the implementing regulations, and HUD's written policies, undermining the only program goals and agency priorities HUD has ever articulated. The injuries to the Named Plaintiffs are described below, and these are typical of injuries all class members are suffering as a result of the grant terminations.

**Halting Critical Programming**

90.     As a result of the terminations, all Named Plaintiffs have been forced to halt critical programming. Because many of these organizations provide unique services in their areas, abruptly shutting down their services not only interferes with the Named Plaintiffs' core operations and frustrates their missions, it also leaves people in perilous circumstances with

nowhere to turn.

91.     For example, MFHC will be forced to stop providing some of its critical programming to groups protected by the FHA, including programming that previously helped clients who had survived domestic violence avoid homelessness. Previously under the grant, MFHC represented a mother of two who received an eviction notice after the person abusing her was arrested. MFHC advocated with her landlord, pointing out that she was protected under both the FHA and Violence Against Women Act, and it succeeded in convincing the landlord not to file an eviction case against her. This allowed the client and her children to stay in their home and prevented an eviction filing that would hurt her chances of finding housing in the future. MFHC currently represents about 50 such clients and accepts about 5 new such cases *per week*, but the grant cancellation will force it to stop accepting *any* new clients for legal cases and housing search assistance. Thus, last week, it said it could not represent another woman who was evicted from her subsidized housing because of domestic violence and now faces displacement from a shelter. MFHC will not be able to represent her in staying in the shelter, finding stable housing, or having her public housing court information impounded to protect her safety. These programming cuts will also fall further on families with children, as MFHC is the only provider of housing search assistance for individuals and families with housing vouchers in their service area. MFHC also has a unique focus within its service area on lead paint advocacy. Because Massachusetts requires remediation of lead paint in rental units only for families with young children, landlords often avoid renting to these families. In 2024, MFHC secured lead remediation in 13 housing units, creating new housing for families. It is no longer able to pursue its housing search assistance work or take on new lead paint advocacy. Stopping its efforts to secure stable housing for women experiencing domestic violence and families with children

frustrates the FHA purpose of preventing housing loss on the basis of protected characteristics, at a dire human cost.

92.    FHCST has advocated for hundreds of people with disabilities to receive reasonable accommodations to housing providers' policies and practices. For example, FHCST successfully worked with a family whose daughter had Down Syndrome to ensure that her emotional support dog was able to remain with her in their apartment and to end the eviction process that the landlord had initiated against the family. As a result of the grant cancellation, FHCST will have to abandon assisting over thirty-five alleged victims of discrimination who have already contacted FHCST since November 2024 to seek FHIP representation, investigation, and assistance with filing their administrative housing discrimination complaints with HUD.

93.    Because many organizations were in the middle of large-scale investigations when funding was cut, they have had been forced to abandon these efforts mid-stream in a way that renders prior work done useless, undermining the FHIP purpose of expanding capacity to investigate fair housing violations throughout the country, particularly of "new or sophisticated forms of discrimination." 42 U.S.C. § 3616a(b)(2).

94.    For example, MFHC is in the middle of a systemic testing project into the potential racial impact of eviction screening policies in the region. It stopped that testing project after completing 2 of 10 three-part tests. If the testing project is not completed, the work that has been done under it so far will be meaningless, and it will hinder MFHC's ability to identify and combat discrimination in eviction screening.

95.    The IFHC was likewise in the middle of testing and investigating multiple housing complexes that have been alleged to have unsafe levels of lead and other heavy metals, resulting in the poisoning of many residents, including women of childbearing age, children,

people with disabilities, and Indigenous communities. It had already conducted several trips and over 15 tests and had additional tests planned. Without FHIP funding, the IFHC will have to end this investigation, and the resources it previously invested will be wasted.

96.    FHCST's systemic investigations will grind to a halt. FHCST's testing initiatives had previously been fully supported by the HUD grant. Due to the HUD grant termination, FHCST will have to abandon seven existing systemic investigations. This includes investigations related to discriminatory treatment due to a person's race, religion, and limited English proficiency; refusal to rent to families with children; denials of reasonable accommodation requests related to disability-related assistance animals; and denials of reasonable structural modification requests from persons who need the structural modifications due to their disabilities.

97.    The organizations were also fulfilling the critical FHIP statutory purpose of providing education and outreach about rights under the FHA to enable housing providers to comply with the statute and housing-seekers to identify and remedy abuses.

98.    FHCST will have to abandon its remaining planned education and outreach activities under the grant, including direct mailing of educational materials to about 1,875 underserved households; outreach activities aimed to organizations addressing homelessness issues; and in-person participation at 11 community events, where staff would have provided housing counseling, referral, and complaint intake services to hundreds of attendees.

99.    HRAC has likewise had to immediately halt its education and outreach activities. It must stop distributing its PSA announcements for radio, television, and print media even though the television and radio ads have already been produced. As a result, over one million television viewers, 75,000 radio listeners, and 135,000 print media subscribers will not receive

the fair housing information these PSAs contain. It must halt its project of designing and placing billboards to reach 350,000 people, and it must find funds to cover the $2,250 balance due to the billboard operator. HRAC will also not be able to conduct outreach and training events designed to reach 800 people. It cannot complete, translate, and distribute its fair housing guide for Older Adults, and it has diminished resources to refer potential victims of housing discrimination to HUD/FHAP. Collectively, these programs would have reached almost everyone in its service area of 1.5 million, leaving a vacuum of information about federal statutory rights.

**Laying Off Staff**

100.    The Named Plaintiffs have been forced to lay off staff members or will shortly have to do so.

101.    MFHC will have to lay off about half its staff if funding is not restored imminently.

102.    The IFHC immediately laid off one staff member, who performed core activities, including intake, investigation, education, and outreach, on behalf of the IFHC. She was the only Swahili speaker employed by the IFHC. As a result of her layoff, the IFHC no longer has the capacity in-house to conduct intakes or targeted outreach to the Swahili-speaking population, and the organization's overall ability to conduct core activities has been diminished. If the grants are not reinstated in 30 days, it will have to do further layoffs, including layoffs of four additional full-time staff.

103.    FHCST laid off four of its staff members: a full-time fair housing specialist and three part-time intake specialists. It also laid off all its per-diem employees. If the funding is not restored, the organization may have to shut down entirely.

**Eliminating and Reducing Other Core Programs**

104.    Because the plaintiff organizations' employees are routinely funded partially through FHIP grants and partially through grants covering other work, the termination of FHIP funds jeopardizes programming throughout the organizations.

105.    The IFHC, for example, will have to cut its service area by about 25%—residents of the most remote, poor, and vulnerable counties will no longer have access to any eviction defense or fair housing services, putting them at increased risk of homelessness. So while the IFHC is currently assisting a young family who is being prevented from living in a mobile home park due to their familial status and their child's disability, the IFHC no longer has the funding to assist them in their housing search.

106.    FHCST will likewise dramatically cut its fair housing work. FHCST has utilized its PEI grant to provide advocacy services to mothers experiencing domestic violence to ensure safe, stable housing for them and their children, but after firing all of its full-time and part-time staff members who evaluated intakes, its ability to provide these services is immediately and critically diminished.

**Shutting Down Entirely**

107.    The grant terminations are an existential threat to the survival of the Named Plaintiff organizations. If the terminations are not rescinded, the IFHC may have to close in the next 3 to 4 months, FHCST in the next 6 months, and MFHC in the next 8 months.

108.    All four organizations are left with substantial confusion and budgeting uncertainty as they try to restructure roles, cut hours, and find alternative funding sources to continue this critical work.

## CLASS ALLEGATIONS

109.    Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and similarly situated grantees.

110.    Plaintiffs Massachusetts Fair Housing Center, Intermountain Fair Housing Council, Fair Housing Council of Southern Texas, and Housing Research and Advocacy Center seek to certify a class consisting of: all FHIP grantees who had grants terminated based on a decision, as communicated through a February 27 form letter, to terminate the grants pursuant to Executive Order 14158, at the direction of the Department of Government Efficiency, on the basis that the grant award "no longer effectuates the program goals or agency priorities."

111.    This action is properly maintained as a class action for the following reasons:

a. ***Joinder.*** Joinder of all class members is impracticable because of the size of the class. Sixty-six organizations received letters terminating their FHIP grants on February 27, 2025, all using the reasoning quoted above. The class is readily ascertainable because it is defined by objective factors.

b. ***Commonality and Predominance.*** The claims alleged on behalf of the proposed class raise questions of law and fact that are common to the class and predominate over questions affecting only individual members. Each class member received a grant pursuant to 42 U.S.C. § 3616a and associated regulations; each class member entered into a Grant Agreement containing substantially the same Terms and Conditions and each class member was in compliance with the terms of the grant; each class member received a Termination Notice on the same day; and each Termination Notice contained the same text and terminated the grants on the same bases. Common questions of law and fact include, among others:

    i.    Whether the HUD Defendants relied on improper considerations in terminating Plaintiffs' grants.

    ii.    Whether the HUD Defendants provided an adequate explanation for its termination decision.

    iii.    Whether it is implausible that Plaintiffs' conduct under their FHIP awards did not effectuate program goals and priorities.

    iv.    Whether the HUD Defendants departed from standard practice in terminating Plaintiffs' awards.

    v.    Whether the HUD Defendants failed to consider important evidence in terminating Plaintiffs' awards.

    vi.    Whether the HUD Defendants are lawfully permitted to take direction from DOGE.

    vii.    Whether the Terminations are contrary to the FHIP statute and Congressional appropriations.

    viii.    Whether DOGE has authority to direct termination of FHIP grants.

    ix.    Whether Plaintiffs will be deprived of an opportunity to vindicate their rights in the absence of judicial review of DOGE's directive to HUD.

    x.    Whether Congress has precluded judicial review of DOGE's directive to HUD.

    xi.    Whether equitable considerations favor judicial review of DOGE's directive to HUD.

c.    ***Typicality.*** The claims of the class representatives are typical of the class because the class representatives received grants pursuant to the same statute and regulations as the other class members; received grants with substantially the same Terms and Conditions

as the class; and received a Termination Notice on the same date as the other class

members, which terminated their grants on the same basis as other class members.

d. ***Adequacy.*** The class representatives and class counsel will fairly and adequately

represent the interests of the class. The class representatives have no interests that are

antagonistic to the interests of other class members, and class counsel have years of

experience in class action and civil rights litigation.

e. ***Appropriateness for Injunctive and Declaratory Relief.*** Defendants have acted or

refused to act on grounds generally applicable to the class, by terminating their FHIP

grants "at the direction of the President of the United States pursuant to Executive Order

14158 . . . and at the direction of the Department of Government Efficiency" and because

the grants "no longer effectuate[] the program goals or agency priorities." The requested

relief, setting aside HUD's decision consistent with Section 706, and enjoining DOGE

from interfering with FHIP-funded grants, will resolve all class members' harm.

## CAUSES OF ACTION

### COUNT I
### Violation of APA § 706(2)(A)
### Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law
### (All Plaintiffs v. HUD Defendants)

112.    The APA authorizes this Court to "hold unlawful and set aside" final agency

action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

the law." 5 U.S.C. § 706(2)(A).

113.    Defendants' termination of Plaintiffs' grant awards constitutes final agency action

under the APA.

114.    The terminations were arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law.

115.    The HUD Defendants acted arbitrarily and capriciously by relying on considerations not permitted in the FHIP statute and regulations when they terminated class members' grants.

116.    The HUD Defendants acted arbitrarily and capriciously by failing to provide a reasoned explanation for their decision. Their two proffered reasons for terminating the grant awards—that DOGE directed their termination and that the awards no longer effectuated program goals or agency priorities—reflect a failure to examine relevant data and articulate a satisfactory explanation for the HUD Defendants' actions, and they fail to demonstrate a rational connection between any facts the HUD Defendants may have found and the choice they made.

117.    It is implausible that the class members' performance under the FHIP grants did not effectuate the program goals or agency priorities, because those activities directly track the program goals and priorities outlined in the statute, regulations, and agency policy documents.

118.    The HUD Defendants acted contrary to law when they relied on DOGE's directive to cancel the class members' grants, even though no statute or regulation permits reliance on a DOGE directive for this purpose.

119.    The HUD Defendants acted contrary to law by terminating grants that further the FHIP statutory purpose and were funded through Congressional appropriations.

## COUNT II
### _Ultra Vires_
### (All Plaintiffs v. DOGE Defendants)

120.    Plaintiffs reallege and incorporate by reference the paragraphs above.

121.    DOGE is purely a creation of executive order; no statute directed or contemplated its existence.

34

122.    DOGE's limited functions are to advise and assist the President; it is not empowered to perform any other functions.

123.    DOGE has no authority in law to direct operations or decisions at government agencies. Despite this, as alleged above, DOGE directed the HUD Defendants to terminate the FHIP grants at issue here. DOGE's actions in doing so were *ultra vires*.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

124.    Certify a class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

125.    Declare Defendants' termination of class members' grants unlawful;

126.    Order the HUD Defendants to reverse the termination decision as communicated on February 27 and immediately reinstate class members' FHIP awards;

127.    Enjoin the HUD Defendants from pausing, freezing, suspending, or terminating any FHIP grants based on either a directive from DOGE or E.O. 14158;

128.    Enjoin the DOGE Defendants from directing or participating in the pausing, freezing, suspending, or terminating FHIP grants.

129.    Award plaintiffs their costs and reasonable attorneys' fees; and

130.    Order such additional relief as this Court deems just and appropriate.

Dated: March 13, 2025                    Respectfully submitted,

*/s/Daniel Ordorica*
Daniel Ordorica (BBO # 705729)
HEISLER, FELDMAN,
& ORDORICA, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
Tel:(413)788-7988
Fax:(413)788-7996
dordorica@hfmgpc.com

Lila Miller*
Reed Colfax*
Zoila Hinson*
Rebecca Livengood*
Yiyang Wu*
Robert Hunter*
RELMAN COLFAX PLLC 1225
19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com
zhinson@relmanlaw.com
rlivengood@relmanlaw.com
ywu@relmanlaw.com
rhunter@relmanlaw.com

*Pro hac vice application pending