# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those similarly situated,* | |
| Plaintiffs, | |
| v. | Civil Action No. 3:25-cv-30041 |
| THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*; U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization*, | |
| Defendants. | |

## DECLARATION OF LISA RICE

I, Lisa Rice, declare as follows pursuant to 28 U.S.C. § 1746:

1.　　I am Lisa Rice, President and Chief Executive Officer of the National Fair Housing Alliance ("NFHA"), a nonprofit 501(c)(3) organization based in Washington, D.C.  I have served in this capacity since April 1, 2018. I was Vice President of NFHA from August 2006 to October 2014 and Executive Vice President of NFHA from October 2014 to March 2018. Before that, I

served as President and Chief Executive Officer of the Toledo Fair Housing Center from 1993 to 2006 and as Interim Executive Director of the Toledo Fair Housing Center from 1990 to 1993. I thus have been involved with the grant program described in this declaration since its inception and for more than 30 years.

2.     I am submitting this Declaration in support of Plaintiffs' Emergency Motion for Provisional Class Certification and Plaintiffs' Emergency Motion for a Temporary Restraining Order requesting that the Court: (1) Order HUD to reverse its termination decision as communicated on February 27 and immediately reinstate Plaintiffs' Fair Housing Initiatives Program (FHIP) awards; (2) Enjoin HUD from pausing, freezing, suspending, or terminating FHIP grants based on either a directive from the Department of Government Efficiency (DOGE) or Executive Order 14158; and (3) Enjoin DOGE from directing or participating in the pausing, freezing, suspending, or terminating of FHIP grants.

3.     NFHA is a national nonprofit, public service, civil rights organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. We are a nationwide alliance of 190 private, nonprofit, fair housing organizations and state and local civil rights agencies throughout the U.S. We have over 70 Operating Member organizations nationwide that support fair housing work in 28 states and the District of Columbia.

4.     NFHA is the country's only national civil rights organization dedicated solely to ensuring equitable housing opportunities for all people and eliminating all forms of housing and lending discrimination. Pursuant to our mission to eliminate all housing and lending discrimination, we work for access to housing without regard to race, national origin, religion, sex

(including sexual orientation and gender identity), disability, and other protected classes covered by federal, state, and local fair housing laws, including the federal Fair Housing Act (FHA).

5.      We do this work through our education and outreach, member services, public policy and advocacy, housing and community development, responsible AI, enforcement, and consulting and compliance programs.

6.      Our Operating Members also conduct activities to advance fair housing and fair lending for all and to enforce fair housing and fair lending laws, including engaging in fair housing policy and advocacy, enforcement, education and outreach; housing counseling; communicating and working with local community leaders on fair housing and lending rights; and conducting training about fair housing and lending rights and responsibilities, the harmful effects of segregation and other discriminatory practices, and the need to counteract the effects of these harmful practices.

7.      One of the primary funding sources supporting NFHA, its members, and other nonprofit organizations in doing this work is HUD's Fair Housing Initiatives Program ("FHIP"). FHIP was established as a pilot program during the Reagan administration by the Housing and Community Development Act of 1987, 42 U.S.C. § 3616(a), and then was permanently authorized by the Housing and Community Development Act of 1992. More than thirty years later, FHIP has become a well-established program that empowers local nonprofits to combat housing discrimination around the country and enjoyed bipartisan sponsorship and support in Congress as necessary to fulfill the FHA's establishment of "fair housing" as the national policy of the United States. The FHIP program, like the Fair Housing Act itself, represents a congressional response to and remedy for the many years during which the federal government itself engaged in

discriminatory practices that denied people fair housing opportunities and contributed to the residential segregation that remains prevalent today.

8.       Every year, the FHIP program receives dedicated, annual appropriations from Congress. HUD, in turn, awards various types of FHIP grants to eligible organizations, including grants to investigate and enforce the FHA (known as Private Enforcement Initiative or "PEI" grants"); to carry out education and outreach activities (Education and Outreach or "EOI" grants); and to develop new fair housing enforcement organizations and develop or expand existing organizations (Fair Housing Organizations Initiative or "FHOI" grants). These awards are made through a competitive process that requires organizations to submit detailed responses to HUD's Notices of Funding Opportunity to ensure that the awarded money is properly spent. HUD has awarded more than $30 million in FHIP grants in each of the last two fiscal years. Most recently, on September 5, 2024, HUD awarded over $32 million in FHIP grants.

9.       Recognizing that uncertainty in annual awards can make it difficult for an organization to make staffing and other investment decisions affecting an organization's ability to carry out its work, HUD began making 3-year FHIP awards in Fiscal Year 2005. These longer-term awards are typically made to organizations of greater capacity and a longer track record. Thus, fair housing organizations reasonably rely on FHIP money as a stable—and sometimes their only—source of revenue, one that is essential to their ongoing operations. NFHA, like its members, is a recipient of FHIP awards. NFHA has received these grants many times over several decades. Many of our members similarly have long track records of receiving FHIP grants, the stability of which has enabled them to continuously assist the victims of housing discrimination, address some of the most intractable forms of housing discrimination, expand access to fair housing

opportunities, and make staffing and other resource investment decisions with some confidence of continued funding.

10.    FHIP PEI grants fund "Fair Housing Enforcement Organizations" like NFHA that meet statutory and regulatory requirements. *See* 42 U.S.C. 3516a *et seq.*; 24 C.F.R. 125.103 *et seq.* PEI grants fund organizations to conduct testing, investigate violations, ensure that community members know and understand their fair housing rights, support community members in obtaining housing and other remedies for discrimination, and otherwise enforce the Fair Housing Act or state or local laws that are substantially equivalent to the rights and remedies provided in the Fair Housing Act. The maximum amount of PEI grants is currently $425,000 per year. As described above, PEI grants are currently awarded on a multi-year basis to further promote long-term planning and stability for fair housing organizations. Such stability permits grantees to better support victims of housing discrimination, whose cases can sometimes last for years, and to plan and conduct systemic investigations, which similarly can take years to complete. NFHA has received multiple FHIP PEI grants dating back to 1991 and is a current recipient of a FHIP PEI grant.

11.    On February 27, 2025, NFHA received a Termination Notice from HUD informing it of HUD's intent to terminate NFHA's FHIP PEI grant effective immediately.

12.    The Termination Notice gave the following basis for termination: that the award "no longer effectuates the program goals or agency priorities."

13.    The Termination Notice was issued "at the direction of the President of the United States pursuant to the Executive Order 14158, 'Establishing and Implementing the President's "Department of Government Efficiency"', and at the direction of said Department of Government Efficiency (DOGE)."

14.     The Termination Notice terminates the remaining balance of $163,518.25 on the award of $400,000 and instructs that "all obligations and activities under [grant] will cease" effective that day, February 27, 2025.

15.     Other FHIP grantees received cancellations at the same time, and for the same stated reasons. NFHA has surveyed its members and others affected by this action. I am aware of 66 organizations that have had their grants cancelled midstream in this manner, with a total of 78 grants cancelled (several organizations had more than one FHIP grant cancelled). The majority of these grantee organizations are NFHA members.

16.     The funding termination affects organizations throughout the country. The following chart lists the states in which an organization lost funding and the number of organizations in that state that lost funding if that number is more than one. As this chart shows, organizations in 33 states will lose key funding as a result of the grant cancellations.

| | | |
|---|---|---|
| Alaska | Illinois - 5 | North Carolina |
| Alabama | Indiana | North Dakota |
| Arizona | Iowa | New Hampshire |
| California – 7 | Kentucky | New Jersey – 2 |
| Colorado | Louisiana | New York – 5 |
| Connecticut | Massachusetts – 3 | Ohio – 6 |
| District of Columbia – 2 | Michigan – 2 | Pennsylvania – 3 |
| Delaware | Minnesota | Tennessee |
| Florida – 5 | Missouri | Texas – 3 |
| Georgia | Mississippi | Vermont |
| Idaho – 2 | Montana | Washington |

17.     NFHA has reviewed virtually all FHIP Termination Notices HUD sent on February 27, 2025. All of the Termination Notices we reviewed were identical except for the FHIP grant number and the name and address of the organization and contact. Based on reports we received from affected grantees, to the best of my knowledge HUD has not provided additional information to any affected grantee regarding the reason for the termination.

18.     I am also familiar with two attachments to all the grants HUD terminated on February 27: Attachment A – Schedule of Articles and Attachment B – Addendum (To The Schedule of Articles).

19.     Attachment A is identical in each one and incorporates by reference OMB Guidance at 2 CFR Chapter I, Chapter II Part 200 et al, "OMB Governmentwide Guidance for Grants and Agreements" and "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards." This OMB Guidance includes the applicable regulations governing termination of grants. The Attachment provides no other basis for termination of a grant.

20.     Attachment B is materially identical in each grant and includes a section entitled "Termination of Grants." The only potential basis for the termination of the grants listed in this section is "[f]ailure of the Grantee to make reasonable efforts to complete the activities to finalize the project within the timeframes set forth in the [Statement of Work]." This section also provides that "**all** FHIP-funded projects **must** address housing discrimination on all bases, i.e., race, color, religion, sex, disability, familial status, and national origin" (emphasis in original).

21.     In practice, it is very rare for HUD to terminate a FHIP grant midstream. I am aware of no instance in which this happened except where a FHIP recipient has engaged in misconduct. HUD has never before claimed the authority to terminate a FHIP grant midstream on the grounds that the FHIP grant is inconsistent with the administration's policy priorities. Moreover, achieving fair housing remains the national policy of the United States, as it has been since 1968 when Congress passed the FHA.

22.     NFHA has been in close contact with the affected grantees and has surveyed them regarding the actions taken and their impact.

23.    Of the 78 cancelled grants, 37 were EOI grants. These grants were for $75,000 or $125,000 annually.

24.    Seven of the grants canceled were FHOI grants. These grants were for $260,000 annually.

25.    Thirty-four of the grants cancelled were PEI grants. All of these grants were for $425,000 annually, except for NFHA's award of $400,000.

26.    Our survey of affected recipients reveals that these abrupt terminations of FHIP funding, if not enjoined, will do immediate, devastating, and irreparable harm to each and every one of the entities in question. This is their primary funding source, in general or for the activity in question. These grants fund specific activities that, in the absence of that funding, will be suspended immediately along with the employees charged with carrying out the grant activities. In many cases, the loss of this FHIP funding threatens to force the closure of the entity in question. Indeed, I am aware of multiple affected entities that already have ceased fair housing operations.

27.    Just to cite a few representative examples:

▪ One affected grantee abruptly lost its PEI grant for $425,000 annually during the first year of its award. As of February 27, 2005, it had six months and $226,670 remaining in year one of the grant. It has ceased all enforcement activities, including intakes and investigations, because it no longer has a source of funding for these activities. It will, at a minimum, have to lay off some of its five employees. It may have to close altogether, depriving its metropolitan area of a fair housing center and vital fair housing services.

▪ Another affected grantee, which lost its PEI grant for $425,000 annually with $212,500 to be paid this year, is immediately laying off three of its six employees, with proportional loss in its capacity to investigate fair housing complaints.

- Another affected grantee lost a $260,000 FHOI grant with two months left in the grant year. This grant funded specific work on issues such as lending discrimination, and work in this area has been frozen, including the cancelation of three active investigations. It expects to soon eliminate the equivalent of three full-time positions and close one of its two office locations to keep other operations ongoing given this unexpected revenue shortfall.

- Another affected grantee lost its PEI grant which paid $425,000 annually. The organization had two months left on its first year and was owed $130,971. It will have to abruptly stop working on many cases in progress and begin furloughing staff. Once that happens, the state where it is located will no longer have any agency, public or private, that assists the victims of housing discrimination.

- And another affected grantee lost a PEI grant that paid $425,000 annually with $170,000 still to be paid in this grant year and another year remaining. This organization, which last year assisted more than 1,000 unique clients, will have to stop all intake; abandon twelve active investigations; abruptly wind down multiple cases that are in administrative proceedings or in court; and begin laying off staff and liquidating assets.

28.     HUD's termination of FHIP grants, if not enjoined, will be catastrophic for the enforcement of the Fair Housing Act in this country. Many of the organizations affected report to us that they will have to close their operations altogether. Others will have to greatly cut back on fair housing enforcement. Either way, that means a vast number of fair housing complaints around the country will never be investigated and enforced. Many people who have brought important complaints to fair housing organizations may return a week later to find that the people who were to investigate their complaints are gone, and perhaps the doors to the organization closed for good.

29.    Fair housing organizations that receive FHIP funding are the primary intake mechanism for fair housing complaints in this country, collectively taking in thousands of fair housing complaints every year. For example, NFHA's 2024 Fair Housing Trends Report found that, of the 34,150 housing discrimination complaints filed in the year 2023—the highest number ever recorded—nonprofit fair housing organizations handled the lion's share—25,789. Private, fair housing organizations processed and investigated 75.52 percent of complaints, compared to 5.10 percent by HUD, 19.26 percent by state and local governmental entities, and 0.12 percent by the Department of Justice.[1]  Collectively, nonprofit fair housing organizations handle far more fair housing complaints than all state, local, and federal government agencies—combined. Moreover, they do so while receiving significantly less funding per case investigated than their state and local government counterparts in fair housing enforcement. Indeed, the number of complaints HUD handles has declined in recent years, even as the number handled by private fair housing nonprofits has increased. These facts make clear that the nation is reliant on the FHIP program and its fund recipients for effective fair housing enforcement.

30.    Private fair housing organizations that rely on FHIP funding weed out unsubstantiated complaints, saving HUD and state and local agencies that labor-intensive task. And when private, nonprofit fair housing organizations do file complaints with HUD or state or local agencies, their involvement makes an enormous difference. One 2011 HUD-commissioned study found that HUD cases in which a fair housing organization is a complainant or co-complainant result in a conciliation (settlement) or a cause finding 71 percent of the time, versus 37 percent for HUD complaints in cases not referred by fair housing organizations.[2] As a HUD

---

[1] See *2024 Fair Housing Trends Report*, (2024) National Fair Housing Alliance. Retrieved at
https://nationalfairhousing.org/wp-content/uploads/2023/04/2024-Fair-Housing-Trends-Report-FINAL_07.2024.pdf.
[2] See *Study of the Fair Housing Initiatives Program*, available at
https://www.huduser.gov/Publications/pdf/FHIP_2011.pdf.

assistant secretary wrote, the study generally confirmed that "without FHIP enforcement funding, it is likely that most enforcement and investigatory work…would no longer occur."[3]

31.    In addition to handling individual complaints, many FHIP recipients use FHIP funds to carry out systemic enforcement of issues that affect large numbers of people. They also use FHIP funds to conduct testing to ferret out discrimination that might otherwise go undetected, since an individual often cannot know she was subjected to discriminatory treatment without seeing how a similarly situated person is treated.

32.    For example, in 2013, NFHA and 11 partner fair housing organizations,[4] using FHIP funds, conducted the only nationwide investigation to date of large apartment complexes to determine how deaf and hard of hearing people are treated when seeking rental property. The investigation and its outcomes were described in a report, "Are You Listening Now?"[5] NFHA and its partner organizations investigated 117 national or regional rental firms in 98 cities and 25 states. NFHA and its partners determined that about 30 of these rental firms—which collectively own an estimated 545,310 apartment units in approximately 2,079 apartment complexes throughout the United States—treated deaf callers quite differently from hearing callers in a manner that appeared to violate the Fair Housing Act. We conducted additional testing of those firms and confirmed this discriminatory treatment. Three complaints filed with HUD resulted in more than $300,000 in relief and required training for management companies. The relief included changes in the companies' business practices to stop discriminatory practices as well as training of personnel as to how to conduct business with persons who are deaf and hard of hearing. This is just one example

---

[3] *Id.* at iii.
[4] Some of these organizations that partnered with NFHA in this effort are among those that lost FHIP funding on February 27.
[5] *Are You Listening Now?: Housing Discrimination Against the Deaf and Hard of Hearing.* (January 9, 2013). National Fair Housing Alliance. Retrieved at https://nationalfairhousing.org/resource/are-you-listening-now-housing-discrimination-against-the-deaf-and-hard-of-hearing/.

of how FHIP funds are used to effectively and efficiently ensure that the Fair Housing Act's requirements are followed.

33. FHIP PEI grants also enable private fair housing organizations to provide vitally important, and at times life-saving, services and supports to victims of discrimination. Private fair housing organizations are currently supporting survivors of domestic violence; children and adults who have been sexually assaulted by a landlord or company employee; senior citizens facing foreclosure due to insurance cancellation and lack of resources to cover home rehabilitations; families facing eviction because they have children; home seekers denied housing access because of their race or national origin; people who are physically or otherwise harassed because of their race, national origin, gender, or other characteristics; and so many more.

34. Activity carried out with FHIP EOI grants also plays an important role in combating discrimination. Grant recipients use these funds to educate housing providers, government officials, tenant and consumer groups, and others about fair housing rights and stake out a visible presence in their communities so that discrimination, when it occurs, is more likely to be reported. HUD's own research shows that most people who experience discrimination never report it. The most frequent reasons given for not reporting housing discrimination are that the victim did not know the law and that the victim did not know how to report it. NFHA also often hears that people do not recognize signs of discrimination. Grant recipients use FHIP EOI grant money to combat these problems. They also conduct trainings that help landlords and others understand best practices to avoid discrimination.

35. FHIP funds thus have proven to be an extremely cost-efficient and effective means of carrying out the country's commitment to fair housing enforcement and advancement, which is why Congress continues to fund the program every year.

36.    It is inconceivable that HUD itself or state and local agencies can pick up the slack if the organizations affected by this funding termination have to cease much or all of their enforcement activities. That is particularly true in light of cutbacks that have already been made to HUD staff recently, as well as further cuts that are planned.[6] Moreover, the type of services and support that private fair housing agencies provide to victims of housing discrimination cannot be provided by either HUD or state and local governmental entities. Private fair housing agencies provide fair housing counseling, direct people to professional and supportive services, educate people about their rights and options, seek out philanthropic resources to assist people, provide small grants to help people avoid displacement or homelessness, canvass neighborhoods, conduct testing and research, connect people with legal counsel, navigate people through the HUD and other governmental complaint administrative processes, conduct undercover investigations, advocate on behalf of victims of discrimination, connect people with law enforcement to process criminal activity, monitor the actions of law enforcement agencies to ensure they are providing accurate support to people and effectively investigating cases, and many other activities. These are all activities that federal, state, and local agencies are not legally allowed to conduct, are not structurally equipped to conduct, are not trained to conduct, or do not have sufficient resources to conduct.

37.    Without the enforcement functions that FHIP recipients provide in partnership with the federal government, predatory landlords and organizations engaging in implicit and explicit bias against underserved communities will be empowered to continue and increase illegal discrimination with little risk of detection or effective enforcement. If not enjoined, this action will

---

[6] See Sally Ho & Jesse Bedayn, *Trump Administration Looks to Slash HUD Workers Tacking the Housing Crisis*, Associated Press, Feb. 21, 2025, available at https://apnews.com/article/doge-hud-trump-turner-affordable-housing-musk-0176c8539fa9b5959198c351c97b8652 (describing plans to cut nearly 77 percent of staff at HUD's Office of Fair Housing and Equal Opportunity, which investigates housing discrimination complaints).

harm people facing sexual harassment by their landlords; families evicted because a family member has become pregnant; home buyers steered by real estate agents to certain homes and away from others based on their race or religion; and people with disabilities denied reasonable accommodations that allow them to safely enjoy their housing. All of these vulnerable people and more depend on enforcement, education, counseling, and other services carried out with FHIP grants. It is for precisely that reason that Congress appropriates money for the FHIP program and grants each year since the program's establishment. If we and our members lose our FHIP funding, we cannot protect these vulnerable people and communities from harm.

38.    The lack of explanation from HUD regarding the rationale for these abrupt terminations has created an even more untenable situation. NFHA and other FHIP recipients have no way to know whether other awarded grants might also be terminated at any time and for any reason. Nor has HUD provided any guidance as to whether, when, or how it will award further FHIP grants, notwithstanding that Congress has appropriated money for them.

39.    The uncertainty of this situation makes it impossible for nonprofit organizations on tight budgets to commit money to key personnel, leases, or other expenditures. As described above, FHIP grant recipients already have been forced to begin laying off employees, closing offices, and otherwise cutting budgets in a way that is difficult to unwind, and even those not forced into these catastrophic steps cannot initiate any actions, hire people, or make any other decision of consequence under these conditions. Every day that HUD is refusing to honor existing FHIP contracts is doing irreparable harm to these organizations and to the nation's ability to detect, combat, and eliminate housing discrimination.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: March 13, 2025

Lisa Rice