# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those similarly situated*,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization*,<br><br>　　　　　　Defendants. | Case No. 3:25-cv-30041<br><br>**REQUEST FOR ORAL ARGUMENT ON AN EMERGENCY BASIS** |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................... i

I.      LEGAL & FACTUAL BACKGROUND ............................................................. 2

II.     LEGAL STANDARD .......................................................................................... 8

III.    ARGUMENT ....................................................................................................... 8

    A.  Plaintiffs Are Likely to Succeed on the Merits of their APA Claims ........................ 9

        1.  HUD's Decision Was Arbitrary and Capricious and an Abuse of Discretion. ........ 9

        2.  HUD's Decision Was Contrary to Law and Exceeded Its Authority. ................... 13

    B.  Plaintiffs Are Likely to Succeed on the Merits of their *Ultra Vires* Claims. .............. 14

IV.     Plaintiffs Will Suffer Irreparable Harm Absent Prompt Relief. ......................................... 15

V.      The Balance of Equities and Public Interest Favor Plaintiffs. ........................................... 18

VI.     This Court Should Issue a Temporary Restraining Order to Protect Plaintiffs ................. 19

On February 27, Defendants terminated 78 Fair Housing Initiatives Program (FHIP) grants. FHIP grants are the lifeblood of Plaintiff fair housing groups, which help individuals and families in their communities avoid homelessness, stave off evictions, find safe places to live, ensure that their homes are accessible, and seek redress for discrimination. The consequences of Defendants' lawless termination decision are dire. Massachusetts Fair Housing Center (MFHC) has already been forced to turn away clients, including a domestic violence survivor facing displacement from her temporary shelter and someone denied housing based on disability. San Antonio Fair Housing Council, Inc., d/b/a Fair Housing Council of South Texas (FHCST), has already laid off nearly half its staff. Intermountain Fair Housing Council (IFHC) will be forced to narrow its service area, leaving ten Idaho counties without *any* eviction prevention or fair housing services. The Housing Research and Advocacy Center, d/b/a Fair Housing Center for Rights and Research (HRAC) cancelled events, ceased training programs, and is scrambling to cover costs. The other sixty-two organizations that received a FHIP termination letter on February 27 are experiencing similarly severe injuries.

Preliminary relief is necessary to stem the tide of harm, and preliminary relief is appropriate because Plaintiffs are likely to succeed on the merits of their claims. HUD terminated Plaintiffs' grants via a form letter at the direction of the so-called Department of Government Efficiency (DOGE).[1] The February 27 Termination was arbitrary and capricious by any measure—among other failures, HUD relied on a wholly inapplicable executive order and offered a boilerplate rationale that is contradicted by all available evidence. DOGE acted *ultra vires* because it has *no* statutory or constitutional authority whatsoever, let alone the authority to

---

[1] Plaintiffs use "HUD" to refer to Defendants HUD and Turner. Plaintiffs use "DOGE" to refer to Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, and Gleason.

direct HUD's administration of FHIP awards. This Court has the express and the inherent authority to set aside Defendants' egregious overstep. Plaintiffs accordingly seek immediate reinstatement of their FHIP grants for themselves and a class of those similarly situated.

## I.     LEGAL & FACTUAL BACKGROUND

Recognizing the fundamental importance of equal access to housing, Congress enacted the Fair Housing Act (FHA) in 1968, expanded its protections in 1988, and permanently established FHIP in 1992. FHIP is Congress's primary means of operationalizing the FHA's broad remedial purpose: Through FHIP, Congress directs HUD to award grants for boots-on-the-ground fair housing work. The impact of these dollars is concrete and profound.

**The FHIP Statute.** The FHIP statute provides for funding to qualified, private nonprofit fair housing agencies to conduct fair housing education programs and to provide intake, testing, investigation, conciliation, and/or litigation of verified complaints of housing discrimination to enforce the remedial goals of the FHA. *See* 42 U.S.C. § 3616a.

At issue here are three funding categories delineated in the FHIP statute, "Private enforcement initiatives" (PEI); "Funding of fair housing organizations" (FHOI); and "Education and outreach" (EOI). *Id.* Congress directed that HUD "shall use funds" for PEI grants, which encompass "a range of investigation and enforcement activities designed to" investigate housing discrimination, "discover and remedy discrimination in public and private real estate markets and real estate-related transactions," and develop models "to respond to new or sophisticated forms of discrimination." *Id.* at (b)(2). Congress also directed that HUD "shall use funds" for FHOI grants to "help establish, organize, and build the capacity of fair housing enforcement organizations, particularly in those areas of the country which are currently underserved by fair housing enforcement organizations as well as those areas where large concentrations of protected

classes exist." *Id.* at (c)(2). Finally, Congress directed that, through EOI grants, HUD "shall establish a national education and outreach program." *Id.* at (d)(1); *see also id.* at (d)(2)–(3).

Since creating the program in 1992, Congress has appropriated funds to HUD to administer FHIP in each fiscal year using similar appropriations language. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 5166 (2022) (appropriating $86,355,000 for "contracts, grants, and other assistance, not otherwise provided for, as authorized by title VIII of the Civil Rights Act of 1968 (42 U.S.C. 3601 et seq.) and section 561 of the Housing and Community Development Act of 1987 (42 U.S.C. 3616a).").

**FHIP Regulations.** HUD promulgated regulations to implement programs described in the FHIP statute. *See generally* 24 C.F.R. § 125 *et seq.* HUD also incorporated the Office of Management and Budget's (OMB) federal grant regulations for FHIP grants. *See* 24 C.F.R. § 85.1 (incorporating and cross-referencing 2 C.F.R. § 200.0 *et seq.*). The PEI regulation "provides funding . . . to investigate violations and obtain enforcement of the rights granted under the Fair Housing Act . . . .";  the FHOI regulation "provides funding to develop or expand the ability of existing eligible organizations to provide fair housing enforcement, and to establish . . . new fair housing enforcement organizations"; and the EOI regulation "provides funding [to support] education and outreach programs designed to inform members of the public concerning their rights and obligations under the provisions of fair housing laws." 24 C.F.R. §§ 125.301–125.501.

The FHIP regulations direct HUD to publish periodic notices setting forth basic information about the awards such as the available amounts, eligible applicants and activities, and selection criteria. 24 C.F.R. § 125.104(d). These periodic notices are called Notices of Funding Opportunity (NOFO). For each fiscal year that funding is available, HUD publishes a NOFO for each FHIP program and, if applicable, for each type of grant. The NOFOs associated

with PEI, FHOI, and EOI grants reiterate and reinforce the statutory and regulatory purposes of FHIP grants. *See, e.g.*, 24 C.F.R. § 125.104(d) (grants must "promote the purposes of the FHIP").

**PEI, EOI, and FHOI Assistance Listings.** Before HUD can announce a NOFO, the OMB regulation requires HUD to "design a program and create an Assistance Listing," which is a public description of the grant program that articulates, among other things, the program's "clear goals and objectives that provide meaningful results" that are "consistent with the Federal authorizing legislation of the program." 2 C.F.R. § 200.202(a)(1).

The Assistance Listings for PEI, EOI, and FHOI grants specify that the program goals are the same as the statutory goals embodied in the FHA. For PEI grants, the objectives are "[t]o assist private non-profit fair housing enforcement organizations in the investigation and enforcement of violations of the rights granted under [the FHA]." Objectives include carrying out testing and other investigative activities." *See* Assistance Listings, Private Enforcement Initiatives, *available at* https://sam.gov/fal/774c16e44a33482d97ec3efa9c04c156/view (last visited Mar. 12, 2025). For FHOI grants, the objective is "[t]o assist organizations that are regional and local, community based and National programs, that develop, implement, carry out, or coordinate programs and/or activities to educate the public about their rights under, the [FHA] or about State or local laws that provide substantially equivalent rights and remedies for alleged discriminatory housing practices." *See* Assistance Listings, Fair Housing Organization Initiatives, https://sam.gov/fal/7045fa85da304dd9b16cb118908bf254/view (last visited Mar. 12, 2025). For EOI grants, the objective is "[t]o assist organizations that are regional and local, community based and National programs, that develop, implement, carry out, or coordinate programs and/or activities to educate the public about their rights under, the [FHA] or about State or local laws that provide substantially equivalent rights and remedies for alleged

discriminatory housing practices." *See* Assistance Listings, Education and Outreach Initiatives, https://sam.gov/fal/4fa4a8856bb348a89f137acbbfc3fb71/view (last visited Mar. 12, 2025).

**DOGE.** DOGE is a government office that was created within the Executive Office of the President by an Executive Order (E.O.) titled "Establishing and Implementing the President's 'Department of Government Efficiency,'" which "publicly renamed" the United States Digital Service "as the United States DOGE Service." Ex. 1, Exec. Order No. 14158, 90 Fed. Reg. 8441, at § 3(a) (Jan. 29, 2025) ("DOGE E.O."). DOGE's work is led by the newly created position of USDS Administrator, currently Amy Gleason, who is formally accountable to only the White House Chief of Staff. *See Id.* § 3(b). DOGE also exercises supervisory authority over the U.S. DOGE Service Temporary Organization, which is an inferior component also created by the E.O. and organized under DOGE. *Id.* (citing 5 U.S.C. § 3161). DOGE's mandate, as defined in the E.O., is "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* § 1. The E.O. contemplates that employees of DOGE will conduct work at other agencies and directs Agency Heads "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b). Critically, the E.O. does not purport to assert supervisory authority over the FHA, FHIP awards, or HUD. Indeed, it does not mention these things at all.

**Defendants' Termination of Plaintiffs' FHIP Awards.** On February 27, 2025 Defendants used a form letter (the "Termination Notice") to alert Plaintiffs of their decision to terminate 78 of Plaintiffs' active FHIP grants, effective immediately. *See* Ex. 2-B, MFHC Feb. 27 Termination Letter. The Termination Notice states that HUD "issue[d]" the termination "at the direction of the President of the United States pursuant to the President's [E.O.] 14158, 'Establishing and Implementing the President's "Department of Government Efficiency"', and

"at the direction of said [DOGE]." *Id.* The Notice also states that the award is being terminated

"because it no longer effectuates the program goals or agency priorities." *Id.* No further

explanation is provided. *Id.*

**The Effect of Defendants' Termination Decision on Plaintiffs and Plaintiffs'**

**Communities.** Plaintiffs are a class of organizations providing fair housing services throughout

the country.[2] Plaintiffs are dedicated to advancing the principles embodied in the FHA. All

Plaintiffs have at least one active FHIP grant, are currently in the middle of their periods of

performance, and have unspent dollars on their FHIP awards.

MFHC has been working for over 35 years in Western and Central Massachusetts to

promote equal housing opportunity through education and outreach, housing mobility

counseling, civil rights investigations, individual representation, impact litigation, and public

policy work. Ex. 2, Decl. of M. St. Cyr. MFHC is in its second year of a multi-year PEI grant of

$1,275,000, $425,000 of which is due this year. *Id.* The grant termination poses an existential

threat. MFHC has already canceled its lease and begun turning away clients in crisis. *Id.* If its

FHIP award is not restored soon, MFHC will be forced to lay off about half its staff, and if the

FHIP award is permanently shut off, MFHC faces complete closure in about 4–6 months. *Id.*

IFHC has been operating in Idaho for over 30 years and serves all 44 counties in the state.

Ex. 3, Decl. of Z. Olson. IFHC assists community members who are experiencing homelessness,

housing instability, or housing discrimination. *Id.* IFHC relies on an FHOI grant of $259,000 for

an enforcement program and two EOI grants totaling about $250,000. *Id.* The loss of this funding

---

[2] The Class is defined as: "All FHIP grantees who had grants terminated based on a decision, as communicated through a February 27 form letter, to terminate the grants pursuant to Executive Order 14158, at the direction of the Department of Government Efficiency, on the basis that the grant award "no longer effectuates the program goals or agency priorities."

threatens the existence of the organization. *Id.* IFHC immediately laid off one staff member and will have to lay off four more if the grants are not reinstated in soon. *Id.* IFHC will also have to cut its service area by about 25%—the most remote and vulnerable residents will lose access to all eviction defense and fair housing services—and eliminate certain activities, like its investigation of housing with unsafe levels of lead and other heavy metals. *Id.*

Since its founding in 1996, FHCST has promoted fair housing through counseling, investigations, testing, mediation, enforcement, outreach, and education. Ex. 4, Decl. of S. Tamez. Its annual budget is about $500,000, $425,000 of which comes from a PEI grant touching all aspects of FHCST's work, including its services for survivors of domestic violence, people with disabilities, and people facing eviction. *Id.* The loss of the PEI grant ($1,275,000 over three years) has an immediate and catastrophic impact on FHCST*:* within thirty days, it will have to lay off close to half its staff, turn away at-risk clients, and cease systemic investigations. *Id.*

HRAC, established in Cleveland in 1994, engages in enforcement, education, and housing mobility work. Ex. 5, Decl. of C. Pleasants. In the past five years, HRAC has handled 2,260 intakes. *Id.* HRAC is the only fair housing organization that conducts public education in its service area, and it received two EOI grants totaling $225,000 to do so. *Id.* As a result of the FHIP termination, HRAC has had to immediately halt its EOI activities—it halted the distribution of already-produced fair housing PSAs that were slated to reach one million television viewers, 75,000 radio listeners, and 135,000 print media subscribers; forwent events designed to reach 800 people; and set aside its fair housing guide for Older Adults. *Id.* The informational vacuum will impair HRAC and its consumers from enforcing the FHA. *Id.*

As a numerical matter, Plaintiffs are 66 organizations spread across 30 states who stand to lose more than $12 million in FHIP funding just this year. As a practical matter, the harm flowing

from Defendants' termination will be felt in hundreds of neighborhoods and by thousands of families. The people who Congress decided to protect will be shut out of housing.

## II.     LEGAL STANDARD

The legal standard for a temporary restraining order "mirrors that for a preliminary injunction." *Schnitzer Steel Indus., Inc. v. Dingman*, 639 F. Supp. 3d 222, 226 (D.R.I. 2022) (citing *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016)). Under that standard, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quotation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). A "district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting omitted).

## III.     ARGUMENT

HUD violated the APA because its termination decision was arbitrary and capricious, contrary to law, and in excess of agency authority. Plaintiffs have multiple paths to prevailing on their APA claim, and the governing law confirms that all are straight shots. DOGE acted *ultra vires* because it lacked authority to direct HUD's termination of Plaintiffs' FHIP awards, meaning that Plaintiffs' likelihood of success on this claim, too, is unobstructed. Plaintiffs have already

suffered the kinds of injuries that courts deem irreparable, and further harm is imminent in the absence of a temporary restraining order. Because this harm deprives Plaintiffs' clients of essential services and because it will undermine enforcement of the FHA, a balance of the equities and the public interest also weigh in favor of preliminary relief.

###### A.    Plaintiffs Are Likely to Succeed on the Merits of their APA Claims.

The APA requires this Court to hold unlawful and set aside final agency action[3] that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Significantly, all of these provisions are "separate standards" operating as independent constraints on agency action. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974). As a result, an agency action that survives review under one provision of Section 706 "may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984) (Scalia, J.) (citation omitted). Here, HUD's termination of Plaintiffs' FHIP grants fails both because it is arbitrary, capricious, and an abuse of discretion, _and_ because it is contrary to law and exceeds HUD's authority. Either ground would alone be adequate to warrant reinstating Plaintiffs' grants.

###### 1.    HUD's Decision Was Arbitrary and Capricious and an Abuse of Discretion.

When it comes to agency action that is arbitrary, capricious, or an abuse of discretion, HUD's termination of Plaintiffs' FHIP grants checks all the boxes: HUD relied on improper

---

[3] HUD's termination decision is a final and reviewable agency action within the meaning of 5 U.S.C. § 704. "[A]gency action" includes an agency's "denial" or "withholding" of a "grant of money." 5 U.S.C. § 551(10), (11), (13). Defendants' termination of Plaintiffs' grants constitutes agency action under those definitions. Defendants' action is also final because it already took effect and generated legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

considerations, provided a patently inadequate explanation, rendered a decision so implausible that it cannot be swallowed, departed from standard practice, and failed to consider important evidence. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Good Samaritan Med. Ctr. v. Nat'l Labor Rel. Bd.*, 858 F.3d 617, 629 (1st Cir. 2017). HUD cannot justify its decision, and Plaintiffs are likely to succeed on their APA claim.[4]

*First*, the Termination Notice expressly states that the February 27 Termination was "at the direction of the President of the United States *pursuant to the Executive Order 14158*, 'Establishing and Implementing the President's [DOGE],' and at the direction of said Department of Government Efficiency (DOGE)." *See, e.g.*, Ex. 2-B, MFHC Termination Notice (emphasis added). But the FHIP scheme—whether looking at the FHIP statute, the FHIP regulations, or the incorporated OMB regulations—is unrelated to the topics covered in the DOGE E.O., which encompasses "government-wide software, network infrastructure, and information technology (IT) systems." *See* Ex. 1. The E.O. is similarly unrelated as to the FHA, as to HUD, as to grants in general, and as to FHIP specifically. A DOGE-related E.O. simply has no place in a FHIP decision, and certainly cannot form the basis for a FHIP award termination.

*Second*, HUD's conclusory rationale for the termination falls far short. Agencies must provide a "reasoned explanation" for their actions, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). In *Encino*, the Supreme Court rejected as inadequate the Department of Labor's explanation of why it changed how it defined the term "salesman":

> An agency must at least display awareness that it is changing position and show that there are good reasons for the new policy. In explaining its changed position,

---

[4] HUD's rationale must be evaluated based on the four corners of Termination Notice. *See, e.g.*, *City of Kansas City v. Dep't of Hous. & Urb. Dev.*, 923 F.2d 188, 193 (D.C. Cir. 1991) ("To judge the adequacy of agency decisionmaking, we must look to the agency decisions themselves. And none of HUD's three decision letters incorporates these secondary communications, nor refers to them in any way as the basis for the agency action.").

>   an agency must also be cognizant that longstanding policies may have engendered
>   serious reliance interests that must be taken into account. In such cases it is not
>   that further justification is demanded by the mere fact of policy change; but that a
>   reasoned explanation is needed for disregarding facts and circumstances that
>   underlay or were engendered by the prior policy.

*Id.* (cleaned up). HUD's Termination Notice meets none of these conditions; it merely parrots the

OMB regulation identifying potential bases for termination. *See Encino*, 579 U.S. at 223

(insufficient for agency to state that it "believes that this interpretation is reasonable" without

explaining why the new policy is more consistent with statutory language). It does not identify a

new policy. It does not provide "good reasons" for the about face. It does not acknowledge the

reliance interests at stake or why they may be disregarded. Quite simply, there's nothing there.

*Third*, any assertion that Plaintiffs' grants do not further FHIP goals or priorities is

implausible. It is impossible to make a straight-faced argument that Plaintiffs' awards do not

advance FHIP's goals and priorities when all available sources say they do. Take MFHC's PEI

grant, which provides for activities like "assisting community members in identifying fair

housing matters, conducting intakes, providing advice and representation, assisting in complaint

filing and dispute resolution, building and maintaining a robust testing program and conducting

complaint-based, audit, and systemic testing investigations." Ex. 2, Decl. of M. St. Cyr, at ¶ 22.

Each of these activities is rooted in the statutory text, if not quoting it directly. *See* 42 U.S.C.

3616a. Similarly, the express objectives in the Assistance Listings[5] for PEI, EOI, and FHOI

grants are the same as the work described in the now-terminated grant agreements. *Compare,*

*e.g.*, Assistance Listings, Private Enforcement Initiatives, *available at*

https://sam.gov/fal/774c16e44a33482d97ec3efa9c04c156/view, *with* Ex. 2-A (Plaintiff MFHC's

---

[5] The OMB regulation requires agencies to design programs and create "Assistance Listings"
with "clear goals and objectives . . . [that are] consistent with the Federal authorizing legislation
of the program," and that "align with the strategic goals and objectives within the Federal
agency's performance plan." 2 CFR 200.202.

HUD 1044).[6] HUD has announced no policy change, and it cannot "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Studios*, 556 U.S. 502, 515 (2009). Because of the near-complete overlap between Plaintiffs' grants and the FHIP statute, HUD's threadbare explanation cannot be saved.

*Fourth*, the termination of Plaintiffs' grants deviated from HUD's ordinary course in meaningful ways. Both the grant agreements themselves and HUD's FHIP manual primarily contemplate termination for non-compliance, not non-effectuation of goals or priorities, and certainly not due to the DOGE E.O. or at DOGE's direction. HUD's manual makes clear that standard operating procedure is to "advise the grantee in writing of the *nature* of the problem" and provide 30 days to respond and/or "correct the deficiency." HUD, *Application and Award Policies and Procedures Guide for FHIP Grantees* 120 (Sep. 2017), *available at* https://www.hud.gov/sites/dfiles/FHEO/documents/APP%20Guide%205.17.17mpn.pdf. There is no allegation of noncompliance here, nor was any notice given. *Fifth and finally*, HUD ignored important evidence, such as how cutting the awards will undermine FHA enforcement, harm home seekers, and decimate critical programs. HUD also ignored Plaintiffs' actual performance.

HUD's termination decision was arbitrary and capricious from every angle and must be set aside. *See New York v. Trump*, --- F. Supp. 3d ---, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) *appeal filed*, No. 25-1236 (1st Cir. Mar. 10, 2025) ("abrupt[]" funding freeze was arbitrary and capricious because it was "difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences—when these funding pauses endanger[ed]" the provision of "vital services").

---

[6] The FHIP awards are "grant agreements" because, unlike procurement contracts, their principal purpose is carry out a public purpose authorized by law, rather than to acquire property or services for the "direct benefit or use of the United States Government." 31 U.S.C. §§ 6303-04.

2.  <u>HUD's Decision Was Contrary to Law and Exceeded Its Authority.</u>

Even if HUD's termination decision were not arbitrary and capricious—and it was—HUD's conduct would be independently invalid under the APA based on the existing FHIP scheme and Congressional appropriations statutes. When an agency administers a federal statute, the agency's power to act is "authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

The FHIP statute leaves little wiggle room: Congress stated that HUD "*shall*" use any funds set aside for the FHIP program to make the enumerated grants. 42 U.S.C. § 3616a. This means that once Congress has appropriated FHIP funding—as it has done every year—HUD must obligate it for grants like those Plaintiffs received. The FHA moreover provides that HUD "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." *Id.* § 3608(e). The statutory and regulatory scheme was functioning as planned until February 27. HUD's termination is contrary to these express requirements of the FHA because HUD is failing to use appropriated funds and because this failure undermines the FHA's purpose.[7]

Moreover, Congress did not provide HUD with authority to take direction from other agencies, either in general or in its administration of FHIP. Section 3616a is silent as to input from other agencies, let alone from DOGE. So too the FHIP regulations. HUD cannot stray beyond these bounds, yet HUD has done so expressly here.

---

[7] HUD cannot lawfully use the funds for anything other than the purposes laid out in the FHIP statute, which is the purpose for which the funds were appropriated. *See* 2 C.F.R. § 200.308(i); *see also* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 370 (2024).

**B.    Plaintiffs Are Likely to Succeed on the Merits of their *Ultra Vires* Claims.**

This Court also has authority to set aside executive action that is *ultra vires* or outside the scope of its statutory or constitutional authority. *City of Arlington*, 569 U.S. at 297. "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). "Equitable actions to enjoin *ultra vires* official conduct do not depend upon the availability of a statutory cause of action; instead, they seek a 'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) (citing *Armstrong*, 575 U.S. at 327), *vacated and remanded on other grounds (mootness)*, 142 S. Ct. 46 (2021). Plaintiffs are likely to succeed on their *ultra vires* claims because neither Congress nor the Constitution has vested DOGE with any authority whatsoever, because DOGE acted contrary to law, and because judicial review is proper here.

*First*, there can be no serious argument that DOGE was acting within its authority when it directed HUD's decision to terminate grants because DOGE has no authority to direct HUD at all. DOGE is not a statutorily created federal agency, nor is DOGE supervised by a statutorily created federal agency. DOGE has no statutory authority to supervise federal agencies granted to it by statute or by the Constitution. DOGE can advise and assist the President, but it is not empowered to perform any other function. DOGE therefore has no authority in law to direct operations or decisions at HUD, yet that is precisely what DOGE has done here, and explicitly so. Because HUD terminated Plaintiffs' grants "at the direction" of DOGE, Ex. 2-B, MFHC Termination Notice, DOGE has exceeded its (virtually nonexistent) authority.

14

*Second*, DOGE's conduct is not just outside the law, it is also *contrary* to law. *Rhode Island Dept. of Env't. Mgmt. v. United States*, 304 F.3d 31, 43 (non-statutory judicial review appropriate where conduct violates a statutory directive). For the reasons set forth above, the termination of Plaintiffs' FHIP awards cannot be squared with the FHIP statute's mandatory language, the FHIP regulation, or OMB regulations. *See supra* Section IV.A.2.

*Third*, the instant scenario merits non-statutory judicial review. *R.I. Dept. of Env't Mgmt.*, 304 F.3d at 43. There is "no indication" that "Congress specifically intended to preclude review of [DOGE]'s determinations," and "absent immediate judicial review," Plaintiffs will be wholly deprived of a meaningful opportunity to challenge DOGE's direction of HUD's grant termination. *Id.* Finally, the legality of DOGE's action and the scope of its authority "do[] not require the application of agency expertise," and is a topic "best addressed by a federal court," *Id.* at 43–44, because the governing law makes clear that DOGE cannot direct FHIP grant terminations. Plaintiffs are likely to succeed on their *ultra vires* claim. *Am. Fed. of Gov't Emps., AFL-CIO v. Office of Personnel Mgmt.*, No. C-25-01780, 2025 WL 660053, at *5 (N.D. Cal. Feb. 28, 2025) (Plaintiffs likely to succeed where agency's "direction to other agencies fell outside its limited statutory authority").

## IV. Plaintiffs Will Suffer Irreparable Harm Absent Prompt Relief.

An injunction is necessary to prevent "substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Such injuries must be "real and immediate." *Biogen Idec MA Inc. v. Trs. of Columbia Univ.*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (quotation omitted). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *Vaquería Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875

15

F.2d 907, 915 (1st Cir. 1989)). Here, Plaintiffs are already suffering multiple forms of irreparable harm, and these injuries will continue and worsen if this Court does not intervene.

*First*, the termination decision has already forced Plaintiffs to halt the provision of certain critical housing services—with devastating effects on their clients. MFHC takes on acute cases within its region, like helping survivors of domestic violence avoid homelessness, but termination of its FHIP grant has forced the organization to stop accepting new clients. Ex. 2, Decl. of M. St. Cyr, at ¶ 9. MFHC has already turned away a person who was evicted from public housing because of domestic violence and is now facing displacement from temporary shelter. *Id.* ¶ 10. Plaintiff FHCST uses its FHIP funding to provide similar services to domestic violence survivors, people facing evictions, and people with disabilities, such as ensuring that a wheelchair user can access her shower. Ex. 4, Decl. of S. Tamez, at ¶ 6–7. Loss of FHIP funding will significantly impair, if not eliminate, these services. This injury is particularly acute because Plaintiffs are often the only housing agencies in their regions. Ex. 3, Decl. of Z. Olson, at ¶ 9, Ex. 2 at ¶ 9. Plaintiffs provide an essential and unique pipeline to safe, affordable, and accessible housing—the loss of which courts have deemed to be irreparable. *See, e.g.*, *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423–24 (11th Cir. 1984).

*Second*, Plaintiffs will have to lay off staff members that are funded in whole or in part by the terminated FHIP grants. Upon receipt of the termination letter, IFHC immediately laid off one staff member, and it will need to lay off an additional four staff members if the grants are not reinstated within thirty days. Ex. 3 at ¶ 8–9. FHCST will need to reduce from seven full- and part-time employees and three per diem team members down to just three employees. Ex. 4 at ¶ 8. HRAC has had to rescind an offer for a paid position that was funded by the now-cancelled grant. Ex. 5, Decl. of C. Pleasants, at ¶ 7. The implications of the staff losses alone are

staggering: dozens of people whose sole job is to carry out Congress' mandate will be forced to stop work, leaving their clients and communities in the lurch.

*Third*, Plaintiffs will have to eliminate or reduce core programs that were funded by FHIP awards, that were managed by staff members that will be (or have been) laid off, and/or that were impacted when Plaintiffs redirected scarce funding to fill the budgetary hole created by the termination of their FHIP awards. For example, MFHC will need to stop its lead poisoning investigation, which was geared toward protecting families with young children, Ex. 2 at ¶ 9, and FHCST will need to stop all testing activities and abandon ongoing investigations, pulling the rug out from under fair housing enforcement in its region. Ex. 4 at ¶ 10–11. HRAC will be forced to halt its outreach activities midstream, losing the time and money it has spent on drafts and planning. Ex. 5 at ¶ 6–8.

*Fourth*, the grant termination represents an existential threat to Plaintiffs' ongoing survival. In the absence of FHIP funding, FHCST and MFHC will be forced to shutter entirely in the near future. Ex. 4 at ¶ 11, Ex. 2 at ¶ 11. *Fifth*, Defendants have created budgetary chaos, confusion, and unpredictability. Plaintiffs had anticipated drawing down on this funding throughout their periods of performance and had planned their work accordingly. They are now scrambling to adjust to the significant changes in their budgets. For example, Plaintiffs will need to skip events, cancel PSA and billboard plans, and forgo payment for work already completed. Ex. 5 at ¶ 6–8.

These are precisely the kinds of injuries that courts have deemed irreparable. For example, in *Open Communities All. v. Carson*, the court found irreparable harm where an agency rule perceptibly impaired an organization's program and conflicted with its mission, 286 F. Supp. 3d 148, 177–78 (D.D.C. 2017) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8

(D.C. Cir. 2016)). The plaintiffs had challenged HUD's delayed implementation of a housing choice voucher rule, and the court deemed impairment to the organization's "ability to assist voucher holders gain access to greater opportunity" irreparable. *Id.* at 178. Courts have also found irreparable harm where third-party clients will be harmed by a loss of services, where agency action creates budgetary uncertainty, where the loss of funding threatens an organization's very existence, and where the organization has no other path to challenge the decision. *See, e.g.*, *New York v. Trump*, 2025 WL 357368, at *13–14 (state residents deprived of services); *United States v. North Carolina*, 192 F. Supp. 3d 620, 629 (M.D.N.C. 2016) ("immediate impact" on provision of "critical resources to the public"); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (budgetary chaos and confusion); *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5–6 (1st Cir. 2019) (risk of closure); *Concord Hosp., Inc. v. NH Dept. of Health and Human Servs.*, 743 F. Supp. 3d 325, 362–63 (D.N.H. 2024) (lack of other challenge avenues). Plaintiffs suffered these exact harms and more. *See* Ex. 6, Decl. of L. Rice (describing impact of terminations on fair housing groups).

Plaintiffs' injuries are severe and ongoing. Their unique roles within their regions mean that the ripple effects of this harm extend far beyond Plaintiffs' ledgers and doors. Preliminary relief is the only way to protect Plaintiffs and their clients from certain and irremediable harm.

**V.    The Balance of Equities and Public Interest Favor Plaintiffs.**

Where the government is a party, as it is here, the Court's inquiry into the balance of the equities and the public interest merges. *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021); *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020). "[T]he public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 (same).

18

It is beyond dispute that the public is benefitted from both ensuring compliance with the FHIP statute—which in turn promotes compliance with the FHA itself—and from preventing the Executive from exceeding its authority. It cannot be said that the public will benefit from the grant terminations when the very purpose of FHIP is to ensure adequate implementation of an anti-discrimination statute and to protect the public's right to equal housing opportunity. And the very purpose of limitations on agency authority and separation of powers more generally is to protect the public from an unchecked government. *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring). The public interest will also be advanced by ensuring that Plaintiffs can provide the services that were funded by their FHIP awards, which are designed to serve their communities. By contrast, Defendants suffer no cognizable harm in disbursing grant funds that Congress has already appropriated and that HUD already obligated. It would strain credulity to contend that terminating Plaintiffs' FHIP awards plays some part in "modernizing Federal technology and software to maximize governmental efficiency and productivity." *See* Ex. 1. In any event, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quotation omitted). Accordingly, all four factors in the temporary restraining order analysis favor immediate relief to protect Plaintiffs and the public alike.

**VI.     This Court Should Issue a Temporary Restraining Order to Protect Plaintiffs.**

A temporary restraining order that "set[s] aside" Defendants' decision and reinstates Plaintiffs' grants is appropriate here. 5 U.S.C. § 706(2).[8] Such relief will do no more than restore the status quo that existed before Defendants' unlawful action.

---

[8] Grant reinstatement is covered by the APA. 5 U.S.C. § 551(11) ("relief" includes "an agency grant of money").

When a "reviewing court determines that [executive actions] are unlawful, the ordinary result is that the [actions] are vacated—not that their application to the individual petitioners is proscribed"—because the executive action itself is treated as a nullity. *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 47 (D.D.C. 2020) (quotation omitted). This reasoning applies at the preliminary stage, just as it does upon entry of final judgment. *Id.* at 49 (collecting cases). And because all members of the Class have been injured by the same unlawful decision, *see* Mem. in Support of Pls. Emergency Mot. for Provisional Class Cert., Dkt. #, it is appropriate to enter an injunction applicable to the Class as a whole. *Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679, at *21 (D. Mass. June 25, 2020) (single agency decision declining to adjudicate students' borrower defense claims applied to entire class of borrowers).

Plaintiffs accordingly ask this Court to enter a temporary restraining order that: (1) Orders HUD to reverse its termination decision as communicated on February 27 and immediately reinstate Plaintiffs' FHIP awards; (2) Enjoins HUD from pausing, freezing, suspending, or terminating any FHIP grants based on either a directive from DOGE or E.O. 14158; and (3) Enjoins DOGE from directing or participating in the pausing, freezing, suspending, or terminating FHIP grants. Plaintiffs also request that this Court order Defendants to file a status report with the Court within 48 hours of entry of a temporary restraining order confirming their compliance with such order and reporting all steps that Defendants, their officers, employees, and agents have taken to comply with the Court's temporary restraining order. A proposed order is attached hereto as Exhibit 7.

Dated: March 13, 2025

Respectfully submitted,

*/s/Daniel Ordorica*
Daniel Ordorica (BBO # 705729)
HEISLER, FELDMAN,
& ORDORICA, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
Tel:(413)788-7988
Fax:(413)788-7996
dordorica@hfmgpc.com

Lila Miller*
Reed Colfax*
Zoila Hinson*
Rebecca Livengood*
Yiyang Wu*
Robert Hunter*
RELMAN COLFAX PLLC 1225
19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
lmiller@relmanlaw.com
rcolfax@relmanlaw.com
zhinson@relmanlaw.com
rlivengood@relmanlaw.com
ywu@relmanlaw.com
rhunter@relmanlaw.com

*\*Pro hac vice* application pending