UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS FAIR HOUSING
CENTER, *et al.*,

                    Plaintiffs,

v.                                                        Civil Action No. 3:25-cv-30041-RGS

THE DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, *et al.*,

                    Defendants.

**DEFENDANTS' COMBINED OPPOSITION TO
PLAINTIFFS' EMERGENCY MOTION FOR PROVISIONAL CLASS
CERTIFICATION (Doc. No. 2) AND PLAINTIFFS'
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER (Doc. No. 4)**

Plaintiffs Massachusetts Fair Housing Center, Intermountain Fair Housing Council, San

Antonio Fair Housing Council, Inc., and Housing Research and Advocacy Center filed a putative

class action alleging that Defendants[1] unlawfully terminated their Fair Housing Initiative

Program ("FHIP") grants on February 27, 2025.

As a threshold matter, this Court lacks jurisdiction over claims seeking to compel

payment of money due under a contract, which is what Plaintiffs seek here. Nor can the Court

review the Department of Housing and Urban Development's ("HUD") discretionary decisions

on how to allocate funds because such decisions are "committed to agency discretion by law."

*See* 5 U.S.C. § 701(a)(2). And, even if the Court could review HUD's grant-termination

decisions, the Court should not impose the extraordinary remedy of a temporary restraining

---

[1] Defendants are the Department of Housing and Urban Development ("HUD"); Scott
Turner (Secretary of HUD); U.S. DOGE Service; U.S. DOGE Service Temporary Organization;
and Amy Gleason (Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary
Organization).

order.

## I.    BACKGROUND

### A.    FHIP Grants

HUD is a federal agency created by the Housing and Urban Development Act of 1965. Among HUD's responsibilities is administration of the Fair Housing Act ("FHA").  Under the FHA and its implementing regulations, HUD has the authority to investigate, attempt to conciliate and, if necessary, adjudicate complaints of discrimination in housing.

HUD's enforcement efforts are supplemented by FHIP, which is a federal grant program that supports private organizations to work to prevent and overcome housing discrimination by increasing compliance with the FHA, and with state and local fair housing laws that provide rights and remedies substantially equivalent to those provided under the FHA.  FHIP does this through grants and cooperative agreements with nonprofit organizations, universities, state and local agencies, legal service agencies and other private entities throughout the country.

FHIP funds support these organizations throughout the country and are used to educate both the public and the housing industry about their rights and responsibilities under the FHA and to assist private, tax-exempt fair housing enforcement organizations in the investigation and enforcement of alleged violations of the FHA.

### B.    Executive Order 14158

On January 20, 2025, President Trump issued Executive Order 14158 ("E.O. 14158" or the "Executive Order"), which "establishe[d] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."  E.O. 14158 § 1, Doc. No. 5-1.  The Executive Order renamed the existing United States Digital Service as "the United States DOGE

Service" ("USDS"), and established USDS "in the Executive Office of the President." *Id*. § 3(a). The Executive Order further established a "USDS Administrator . . . in the Executive Office of the President who shall report to the White House Chief of Staff." *Id*. §3(b).

Importantly, the Executive Order provided that "each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees," which "Agency Heads shall select . . . in consultation with the USDS administrator." *Id*. § 3(c). "Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE agenda." *Id*. The Executive Order expressly states that nothing therein "shall be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency, or the head thereof." *Id*. § 5(a)(i).

### C.    Plaintiffs' Complaint

On March 13, 2025, Plaintiffs filed a putative class action alleging that HUD unlawfully terminated 78 FHIP grants on February 27, 2025.  Class Action Compl. (Mar. 13, 2025), Doc. No. 1, ¶ 2 ("Compl.").  The named Plaintiffs are non-profit fair housing organizations whose FHIP grants HUD terminated on February 27.  *Id*. ¶¶ 14-17, 54, 70, 78, 84, 88.

Plaintiffs do not allege that HUD terminated every FHIP grant in existence on February 27, 2025.  But Plaintiffs allege that each letter from HUD terminating a Plaintiff's FHIP grant stated that termination was "at the direction of the President of the United States pursuant to the Executive Order 14158, 'Establishing and Implementing the President's Department of Government Efficiency,' and at the direction of said Department of Government Efficiency." Doc. No. 5-2 at 83; Doc. No. 5-3 at 222, 225, 228; Doc. No. 5-4 at 83; Doc. No. 5-5 at 152, 155. HUD's termination letter further explained that HUD was "terminating this award because it no

longer effectuates the program goals or agency priorities."  Doc. No. 5-2 at 83; Doc. No. 5-3 at

222, 225, 228; Doc. No. 5-4 at 83; Doc. No. 5-5 at 152, 155.  The letter also stated that each

Plaintiff could administratively appeal grant termination within 30 days.  Doc. No. 5-2 at 84;

Doc. No. 5-3 at 223, 226, 229; Doc. No. 5-4 at 84; Doc. No. 5-5 at 153, 156.  Plaintiffs do not

allege that they have filed any administrative appeal.

Plaintiffs allege that termination of their FHIP grants have forced Plaintiffs "to shutter

programs, terminate services, lay off staff members, and shrink their core activities," while some

"face the likelihood of near-term closure."  Compl. ¶¶ 4, 89-108.

Plaintiffs' complaint asserts two claims.  First, Plaintiffs claim that the decision to

terminate the FHIP grants violated the Administrative Procedure Act ("APA") because it was

arbitrary and capricious, and otherwise contrary to law.  *Id*. ¶¶ 112-19.  Second, they claim that

DOGE's alleged directive that HUD terminate the FHIP grants was *ultra vires*.  *Id*. ¶¶ 120-23.

Among other relief, Plaintiffs request that the Court certify their proposed class; declare

the termination of FHIP grants unlawful; reinstate class members' FHIP grants; enjoin HUD

"from pausing, freezing, suspending, or terminating any FHIP grants based on either a directive

from DOGE or E.O. 14158"; and enjoin DOGE "from directing or participating in the pausing,

freezing, suspending, or terminating FHIP grants."  *Id*. ¶¶ 124-28.

On the same day Plaintiffs filed the complaint, they also filed an emergency motion for

provisional class certification (Doc. No. 2) and for a temporary restraining order (Doc. No. 4).

### D.    Declaration of HUD Employee Matthew Ammon

Matthew Ammon, who has worked for HUD since 1996, signed the termination letter for

each of the 78 FHIP grants terminated on February 27, 2025.  Ex. 1, Ammon Decl. (March 21,

2025), ¶¶ 1-2, 8.  Mr. Ammon is "a member of HUD's career Senior Executive Service (SES)

and serve[s] as the Director of the Office of Lead Hazard Control and Healthy Homes." *Id*. ¶ 2. Since February 12, 2025, Mr. Ammon has been "delegated the authority to perform the delegable duties of the Deputy Secretary of HUD." *Id*.

Mr. Ammon is "not a member of HUD's internal Department of Government Efficiency (DOGE) task force"—also known as "HUD's agency DOGE team"—"which is composed of HUD employees."[2]  *Id*. ¶¶ 2, 4.  "As HUD employees, neither the members of HUD's internal DOGE task force or [Mr. Ammon] are employees of the 'Department of Government Efficiency'—which is a phrase that describes one of the President's policy initiatives and its related structure within federal agencies rather than a freestanding governmental department—or the 'U.S. DOGE Service (USDS),' which is an Executive Office of the President component external to HUD." *Id*. ¶ 3.  According to the Ammon Declaration, "USDS has no authority to direct HUD or HUD officials to terminate grants or take any other actions on behalf of HUD." *Id*.

According to the Ammon Declaration, "HUD's internal DOGE task force . . . commenced a review of all competitively awarded grants . . . for consistency with Administration goals and priorities." *Id*. ¶ 4.  HUD's internal DOGE task force conducted "an initial non-final review of individual awards for consistency with Executive Orders and Administration directives," *id*. ¶ 5, and requested Mr. Ammon's approval "to move forward with terminating certain awards if the task force later, after award-by-award review, made a final determination that an award should be terminated," *id*.

---

[2] E.O. 14158 provided that "each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees," which "Agency Heads shall select . . . in consultation with the USDS administrator."  E.O. 14158 § 3(c), Doc. No. 5-1.

On February 24, 2025, Mr. Ammon "granted HUD's internal DOGE task force that authority to make final determinations on whether certain awards should be terminated, and if so, to coordinate with applicable program offices to ensure the orderly closeout of such awards consistent with the applicable terms of the award or as provided in 2 CFR Part 200." *Id*.

Thereafter, "HUD's internal DOGE task force completed its award-by-award review" of FHIP grants "in collaboration with HUD's Office of Fair Housing and Equal Opportunity (FHEO), and identified 78 FHIP awards that should be terminated under 2 C.F.R. § 200.340(a)(4) because they no longer effectuate the program goals or agency priorities." *Id*. ¶ 6. "More specifically, HUD's internal DOGE task force identified that each of those awards is incompatible with one or more of the following Executive Orders": (1) Executive Order 14148 ("Initial Rescissions of Harmful Executive Orders and Actions"); (2) Executive Order 14151 ("Ending Radical and Wasteful Government DEI Programs and Preferencing"); (3) Executive Order 14154 ("Unleashing American Energy"); (4) Executive Order 14159 ("Protecting the American People Against Invasion"); (5) Executive Order 14168 ("Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"); and (6) Executive Order 14173 ("Ending Illegal Discrimination and Restoring Merit Based Opportunity"). *Id*. ¶ 6.

HUD's internal DOGE task force identified the terminated FHIP awards as "incompatible with one or more of the above Executive Orders because those awards include language that specifically imposes" subjects such as "DEI." *Id*. ¶ 7. HUD's internal DOGE task force also concluded that the terminated FHIP grants "authorize[d] the use of Federal funds for training, enforcement, and other related activities in a manner for activities beyond the scope of the statutorily enumerated protections of the Fair Housing Act and other Civil Rights laws." *Id*.

On February 27, 2025, Mr. Ammon signed the letters terminating the FHIP grants at issue having "adopted" HUD's internal DOGE task force's "reasoning as [his] own[.]" *Id.* ¶ 8. "The 78 FHIP awards, for which termination letters were issued on February 27, 2025, are only a subset of the total number of open FHIP awards, as HUD's award-by-award review determined that not all open FHIP awards are inconsistent with Executive Orders and no longer effectuating program goals or agency priorities." *Id.* ¶ 9.

## II.     LEGAL STANDARD

### A.     Temporary Restraining Order

"The Court applies the same standard in assessing requests for temporary restraining orders and preliminary injunctions." *Foundation Med., Inc. v. Kittle*, No. 25-10298-RGS, 2025 WL 563067, at *1 (D. Mass. Feb. 20, 2025) (quoting *Goldstein v. Batista Contracting LLC*, 671 F. Supp. 3d 68, 72 (D. Mass. 2023)).  Plaintiffs "must show: '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *Id.* (quoting *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020)).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).

At bottom, however, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

### B.    Provisional Class Certification

"To satisfy Rule 23, the nominee class representatives must establish the four elements of Rule 23's subpart (a), and one of the elements of subpart (b)."  *Durmic v. J.P. Morgan Chase Bank, NA.*, No. 10-cv-10380-RGS, 2010 WL 5141359, at *2 (D. Mass. Dec. 10, 2010) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997)).  "The Rule 23(a) elements are (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation."  *Id*.

## III.    ARGUMENT

### A.    The Court Lacks Jurisdiction to Issue Preliminary Injunctive Relief

"[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further."  *Griffith v. Bowen*, 678 F. Supp. 942, 944 (D. Mass. 1988).  As a general rule, the federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity."  *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022).  To sue a federal agency, a plaintiff must therefore identify an express waiver in the text of a federal law and show that its claim falls within the waiver's scope. *See FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("a waiver of sovereign immunity must be 'unequivocally expressed' in statutory text").  Here, Plaintiffs seek to rely on the APA, which includes a limited waiver of sovereign immunity for claims "seeking relief other than money damages."  5 U.S.C. § 702.  That limited waiver does not, however, extend to this action for two independent reasons.

#### 1.    The Court lacks jurisdiction to compel HUD to pay money owed under the grant agreements.

*First*, when a party seeks to access funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA.  The Tucker Act provides that the "United States Court of Federal Claims shall have

jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). Under First Circuit precedent, the Tucker Act vests exclusive jurisdiction over a case in the Court of Federal Claims where the plaintiffs are effectively seeking damages for breach of contract. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987); *American Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62 (1st Cir. 1978). And, under these circumstances, courts have routinely held that "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004) (treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

Recently, in *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, the district court concluded it lacked jurisdiction to enjoin the "pausing or canceling of contracts" between a private entity and the federal government. No. 1:25-cv-465, 2025 WL 763738, at *1, 6 (D.D.C. Mar. 11, 2025). There, the State Department had terminated contracts providing money to plaintiff to resettle refugees, and plaintiff sued under the APA. *Id*. at *2-4. But the court held that plaintiff's suit belonged in the Claims Court because, "[s]tripped of its equitable flair," plaintiff's "requested relief [sought] one thing": plaintiff "want[ed] the Court to order the

Government to stop withholding the money due under" the contracts—the "classic contractual remedy of specific performance." *Id*. at *5, 7 (quotation omitted).

So too here.  The sole source of the rights that—if vindicated—could conceivably result in the forced payment of funds from HUD to Plaintiffs are the grant agreements.  Plaintiffs do not claim that any statute or regulation entitles them, in particular, to these grants; instead, their relief is purely a matter of contract.  Moreover, Plaintiffs seek as relief a temporary restraining order that would "restore the status quo that existed before" HUD terminated their grants.  Pls.' Mem. of Law in Support of Pls.' Emergency Mot. for a Temporary Restraining Order (Mar. 13, 2025), Doc. No. 5 at 19 ("Mem.").  But "an injunction to compel the payment of money past due under a contract" is an action at law—not equity.  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002); *see Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations.").

As the First Circuit has explained, the APA's waiver of sovereign immunity for claims seeking relief other than money damages does not extend to "specific performance for breach of contract." *Id.*  Thus, this Court lacks jurisdiction to order HUD to pay money allegedly owed under the grants.[3]

___

[3] Admittedly, another session of this Court recently held that plaintiffs challenging termination of federal grants sought "equitable relief in the form of reinstatement of the" grants, rather than relief for "past pecuniary harms," such that the court had jurisdiction.  *California v. U.S. Dep't of Educ.*, No. 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (citing *Mass. v. Nat'l Insts. of Health*, No. 25-cv-10338, 2025 WL 702163, at *8 (D. Mass. Mar. 5, 2025)).

In response, the United States sought emergency relief in the First Circuit, which the First Circuit denied today.  *See generally California v. U.S. Dep't of Educ.*, No. 25-1244, slip op. (1st Cir. Mar. 21, 2025).  In denying the government's motion for a stay pending appeal, the First Circuit considered whether the district court had jurisdiction over plaintiffs' challenge of terminated federal grants, as well as whether such termination was committed to agency

**2.    The Court cannot review HUD's discretionary decisions regarding how to allocate funds.**

*Second*, the APA does not permit judicial review of "agency action" that "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  Plaintiffs admit that "a grant may be terminated where it 'no longer effectuates the program goals or agency priorities[.]'"  Compl. ¶ 61 (citing 2 C.F.R. § 200.340.(a)(4)); *see also, e.g.*, Doc. No. 5-2 at 52 (incorporating 2 C.F.R. § 200.340(a)(4) into FHIP grants).  The Court therefore lacks jurisdiction because HUD's decisions here—which concerned how best to re-allocate funds to align with its policy objectives—were decisions committed to agency discretion by law.

In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decisionmaking standards.  *See id.* at 185-88.  The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in

---

discretion by law, or arbitrary and capricious.  *Id*. at 6-14.  However, the First Circuit's discussion of these issues "assess[ed] only the likelihood of success on the merits as the record now stands and [did] not constitute a holding on the merits."  *Id*. at 6.  The United States is considering seeking emergency relief from the Supreme Court.

fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

The FHIP grant programs here confer significant discretion in determining how best to allocate appropriate funds across applicants. Congress provided that the Secretary of HUD "may make grants to, or (to the extent of amounts provided in appropriation Acts) enter into contracts or cooperative agreements," with organizations to carry out certain specified activities. 42 U.S.C. § 3616a(a). The statute does not constrain the Secretary's discretion to determine how best to allocate the funding for each program among many different potential grant recipients. To the extent § 3616a provides that HUD "shall use funds," it does not direct how to allocate funds among specific recipients. Accordingly, the Department's decisions in this context are discretionary decisions regarding how to allocate funds, not subject to arbitrary-and-capricious review under the APA. *Cf. N.A.A.C.P. v. Sec'y of Housing & Urban Dev.*, 817 F.2d 149, 157-160 (1st Cir. 1987) (allowing judicial review of a claim that HUD's administration of grants over time violated 42 U.S.C. § 3608(e)(5), but also recognizing that "some, many, or all" individual grant decisions may be unreviewable).

### B.    Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits of their APA Claim

Even if this Court has jurisdiction over Plaintiffs' APA claim, Plaintiffs cannot obtain a temporary restraining order because they have not shown a likelihood of success on the merits.

"[P]roving likelihood of success on the merits is the '*sine qua non*' of a preliminary injunction." *Akebia*, 443 F. Supp. 3d at 225. "Therefore, '[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity.'" *Id.* (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)).

### 1.    HUD's decisions were not arbitrary and capricious.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The arbitrary-and-capricious standard "is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). At bottom, this deferential standard requires only that "agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).[4]

Plaintiffs first argue that HUD improperly relied on E.O. 14158 to terminate Plaintiffs' FHIP grants. Mem. at 10. It is true that E.O. 14158 does not address HUD, federal grants in general, or FHIP grants in particular. However, the Ammon Declaration explains that, pursuant to E.O. 14158, HUD's internal DOGE task force "commenced a review of all competitively awarded grants and agreements (collectively 'awards') for consistency with Administration goals

---

[4] Although the Supreme Court recently overturned the doctrine of *Chevron* deference, the Court made clear that the APA "*does* mandate that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2261 (2024) (emphasis in original).

and priorities." Ex. 1, Ammon Decl. ¶ 4. Moreover, the Ammon Declaration explains that HUD determined that the terminated FHIP grants were incompatible with one or more of six other Executive Orders after conducting an "award-by-award review in collaboration with HUD's Office of Fair Housing and Equal Opportunity[.]" *Id*. ¶¶ 6-7. Accordingly, HUD terminated the grants "under 2 C.F.R. § 200.340(a)(4) because they no longer effectuate the program goals or agency priorities." *Id*. ¶ 6. As that regulation states, "agency priorities" are expressly relevant to termination analysis.

Plaintiffs further argue that "termination of Plaintiffs' grants deviated from HUD's ordinary course in meaningful ways" because "the grant agreements themselves and HUD's FHIP manual primarily contemplate termination for non-compliance . . . ." Mem. at 12. But Plaintiffs admit that "a grant may be terminated where it 'no longer effectuates the program goals or agency priorities[.]'" Compl. ¶ 61 (citing 2 C.F.R. § 200.340(a)(4)). In fact, 2 C.F.R. § 200.340(a)(4) was incorporated into the FHIP grants at issue. *E.g.*, Doc. No. 5-2 at 52. And while HUD's FHIP Application and Award Policies and Procedures Guide[5] ("FHIP Manual") provides that, "[n]ormally," grant termination "will be taken only after the grantee has been informed of the proposed action, or informed of any deficiency on its part and given an opportunity to correct it," FHIP Manual at 119, the FHIP Manual also states that HUD may terminate a grant upon "other reasonable cause" (as opposed to non-compliance), and that HUD "may immediately . . . terminate a grant without notice when it believes such action is reasonable to protect the interests of the government." *Id*.

---

[5] Available at https://www.hud.gov/sites/dfiles/FHEO/documents/
APP%20Guide%205.17.17mpn.pdf.

Plaintiffs also argue that HUD did not provide a "reasoned explanation" for its termination decisions, and that it is "implausible" that Plaintiffs' FHIP grants do not further "*FHIP* goals or priorities." Mem. at 10-12 (emphasis added) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)); *cf.* 24 C.F.R. § 200.340.(a)(4) ("program goals or *agency* priorities") (emphasis added). Here, the grant-termination letter explained that HUD was "terminating this award because it no longer effectuates the program goals or agency priorities." *E.g.*, Doc. No. 5-2 at 83. Plaintiffs concede that HUD may terminate a FHIP grant on that basis. Compl. ¶ 61 (citing 2 C.F.R. § 200.340(a)(4)). Moreover, the Ammon Declaration states that HUD conducted an "award-by-award review" of the terminated grants, determined they ran afoul of one or more of the enumerated executive orders and otherwise exceeded the scope of the FHA, and terminated them accordingly.[6] Ex. 1, Ammon Decl. ¶¶ 6-8. HUD's review of grants based on the "Administration's priorities" was regular and lawful. *See Department of Commerce v. New York*, 588 U.S. 752, 781 (2019). And because HUD's priorities are matters of policy discretion and not of "factual findings," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), a shift in those priorities does not require any additional explanation under the APA.

Finally, without further factual development, the Court should not base any preliminary relief on Plaintiffs' allegation that "HUD ignored important evidence, such as how cutting the awards will undermine FHA enforcement, harm home seekers, and decimate critical programs." Mem. at 12.

---

[6] *But see California*, 2025 WL 760825, at *3 (finding that an agency arbitrarily terminated grants where it listed possible reasons for their termination but did not specify which grant was terminated for which reason; such reasons were conclusory in any event; and the agency failed to justify a "drastic change" in policy).

### 2.    HUD's decisions were not contrary to law.

Again, the APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706(2)(A).  Plaintiffs contend that HUD's termination of FHIP grants violates 42 U.S.C. § 3616a because, in Plaintiffs' view, Congress required HUD to "use any funds set aside for the FHIP program to make the enumerated grants."  Mem. at 13.  However, Plaintiffs concede that "a grant may be terminated where it 'no longer effectuates the program goals or agency priorities[.]'"  Compl. ¶ 61 (citing 2 C.F.R. § 200.340(a)(4)).  And HUD cited that precise reason in its letters terminating Plaintiffs' grants.  *See, e.g.*, Doc. No. 5-2 at 83.  Moreover, § 3616a does not require that HUD allocate funds to specific recipients.  *See* Ex. 1, Ammon Decl. ¶ 7 ("The task force further identified that . . . use of Federal Funds for purposes beyond the specific scope of these statutes dilutes and diminishes the availability of Federal funds to carry out the specific, statutorily-authorized functions of the Department.").

Plaintiffs further argue that termination of Plaintiffs' FHIP grants was unlawful as contrary to 42 U.S.C. § 3608(e)(5), which provides that the Secretary of HUD "shall . . . administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" the FHA.  Mem. at 13.  "Clearly, HUD possesses broad discretionary powers to develop, award, and administer its grants and to decide the degree to which they can be shaped to help achieve Title VIII's goals."  *N.A.A.C.P. v. Sec'y of Housing & Urban Dev.*, 817 F.2d 149, 155 (1st Cir. 1987); *see McGrath v. Dep't of Housing & Urban Dev.*, 722 F. Supp. 902, 908 (D. Mass. 1989) ("HUD has broad discretionary powers with which to implement its policies and fulfill its affirmative obligation to support fair housing.") (collecting cases).  Accordingly, § 3608(e)(5) "does not mandate specific actions or remedial plans which

HUD should undertake,"[7] *McGrath*, 722 F. Supp. at 908, such as funding particular grants, as requested by Plaintiffs.

### 3.    DOGE did not act *ultra vires*.

Aside from their claim under the APA, Plaintiffs also allege that DOGE acted outside its authority by "direct[ing] the HUD Defendants to terminate the FHIP grants at issue here." Compl. ¶ 123.  Plaintiffs have not shown a likelihood of success on this claim, either.

"Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the" APA.  *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (internal citation omitted).  Plaintiffs argue that DOGE was not acting "within its authority when it directed HUD's decision to terminate grants" and that DOGE's termination decisions were contrary to law.  Mem. at 14.

But the Ammon Declaration explains that it was an internal DOGE team at HUD—not the U.S. DOGE Service—that made the termination decisions here.  The Ammon Declaration states that HUD's internal DOGE task force, which was composed of HUD employees (rather than external DOGE employees), individually reviewed the terminated grants to determine which did not comply with the enumerated Executive Orders.  Ex. 1, Ammon Decl. ¶¶ 2-3, 6-7.  Mr. Ammon—who has been employed by HUD for nearly 30 years and who is not a member of HUD's internal DOGE task force—adopted the internal DOGE task force's reasoning as his

---

[7] In fact, at least one court has held that although a plaintiff may assert, under the APA, that an agency "has failed generally and programmatically to fulfill" § 3608's mandate "overall," the APA does not permit suits that "seek[] review" of "particular" agency choices because "Section 3608[] lacks any judicially manageable standard . . . for judging how and when an agency should exercise its discretion."  *Jones v. OCC*, 983 F. Supp. 197, 203-04 (D.D.C. 1997), *aff'd*, No. 97-5341, 1998 WL 315581 (D.C. Cir. May 12, 1998) (internal quotations omitted).

own, approved termination of the FHIP grants, and signed the termination letters. *Id*. ¶¶ 2, 8.[8]

*Cf. Does 1-26 v. Musk*, No. 25-0462-TDC, 2025 WL 840574, at *13 (D. Md. Mar. 18, 2025)

("Generally, the Appointments Clause is not violated when a duly appointed Officer authorizes

or ratifies an exercise of significant authority that was otherwise initiated or first approved by a

non-Officer.").

### C.    The Balance of Equities and Public Interest Weigh Against a Temporary Restraining Order

Even if Plaintiffs have established irreparable harm, Defendants further maintain that

Plaintiffs have not shown that "the balance of equities and consideration of the public interest"

favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines

whether the movant's likely harm "will outweigh the harm which granting the injunction would

inflict on [the defendant]." *7-Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014).

And then it considers whether "[t]he public interest weighs in favor of granting" the preliminary

injunction. *Id.* at 285. But where, as here, the government is the defendant, these factors simply

"merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs have no cognizable interest in receiving federal funds to which they are not

legally entitled or on a timeline that is not legally compelled. And here, if the money is held by

Defendants during the pendency of the case, the grantees can still obtain and use it at the end of

the case. But the opposite is not true—if the grantees are given access now, and draw down the

funds throughout the litigation, Defendants will be left with no meaningful recourse even if they

prevail. While the government has mechanisms to recoup monies that are expended *unlawfully*,

---

[8] To the extent Plaintiffs argue that DOGE's conduct was "contrary to law," the argument
fails because Plaintiffs have not established that Defendants' conduct was contrary to law under
the APA. Mem. at 15. Moreover, Plaintiffs need not resort to non-statutory review when they
raise claims challenging the grant terminations under the APA. *Id.*

Plaintiffs would presumably dispute that funds expended per the grant's terms while the termination has been enjoined would fall in that category. Accordingly, Defendants will bear all the risk if the Court enters a temporary restraining order. Indeed, there are less onerous options to preserve the status quo, such as an order to hold the funds without re-obligating them to other uses pending the outcome of the litigation.

Nonetheless, Plaintiffs assert that "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." Doc. No. 5 at 19 (citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). But, for one thing, the case that Plaintiffs cite dealt with whether to preliminarily enjoin an allegedly unlawful immigration detention practice—not whether the forced payment of possibly unrecoverable funds constitutes irreparable harm. For another, Plaintiffs' analysis incorrectly merges the likelihood-of-success and balancing-of-the-equities factors.

### D.    If the Court Issues a Temporary Restraining Order, It Should Require Plaintiffs to Provide Security

Finally, if the Court issues a temporary restraining order, it should require Plaintiffs to post a bond. Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court should set bond at the amount of the grants that Plaintiffs could draw down over the period during which any temporary restraining order is in effect.

### E.    The Court Should Stay Any Temporary Restraining Order Pending Appeal

Moreover, if the Court grants Plaintiffs' emergency motion for a temporary restraining order, it should stay any such order pending any appeal, because Defendants are likely to

succeed on appeal and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). On the whole, as argued above, a stay is warranted.

### F.    The Court Should Not Certify a Provisional Class

Finally, the Court should deny Plaintiffs' motion for provisional class certification. Doc. No. 2. For one, the Court lacks jurisdiction over this matter such that it should not certify a class to litigate it. And even if the Court does have jurisdiction, Rule 23 and its advisory notes cast doubt on the propriety of class certification on a truncated record. *See* Fed. R. Civ. P. 23(c)(1) (directing determination on class certification at an "early *practicable* time") (emphasis added); Fed. R. Civ. P. 23 advisory committee's note to 2003 Amendment (noting that "[t]ime may be needed to gather information necessary to make the certification decision[,]" and that a "court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met").

That is particularly so where, as here, the record may ultimately show individualized decisionmaking as to each grant determination, which would undermine certification of a class. Ex. 1, Ammon Decl. ¶ 6; *see Durmic*, 2010 WL 5141359, at *4 (declining to certify a provisional class due to "the importance of developing a more robust factual record before the certification issue is joined").

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for provisional class certification (Doc. No. 2) and a temporary restraining order (Doc. No. 4).

Dated: March 21, 2025                    Respectfully submitted,

                                         LEAH B. FOLEY
                                         United States Attorney

                            By:    */s/ Julian N. Canzoneri*
                                   Julian N. Canzoneri
                                   Assistant U.S. Attorney
                                   U.S. Attorney's Office
                                   John Joseph Moakley U.S. Courthouse
                                   One Courthouse Way, Suite 9200
                                   Boston, Massachusetts 02210
                                   (617) 748-3170
                                   julian.canzoneri@usdoj.gov

## CERTIFICATE OF SERVICE

   I hereby certify that a true copy of the above document was served upon the attorneys of record by means of the Court's Electronic Case Filing system on March 21, 2025.

                                   */s/ Julian N. Canzoneri*
                                   Julian N. Canzoneri
                                   Assistant U.S. Attorney