# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those similarly situated*, | Civil Action No. 3:25-CV-30041-RGS |
| *Plaintiffs*, | Judge Richard G. Stearns |
| v. | |
| THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization*, | |
| *Defendants*. | |

## REPLY IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

**I.     In Light of The Declaration of Matthew Ammon, Plaintiffs Seek Preliminary Relief Against the HUD Defendants Only.**

Plaintiffs hereby withdraw their request that this Court enjoin Defendants U.S. DOGE

Service, U.S. DOGE Service Temporary Organization, and Amy Gleason ("DOGE Defendants")

as part of their motion for preliminary relief. Defendants have now conceded that the DOGE

Defendants cannot direct the Department of Housing and Urban Development's (HUD)

administration of Fair Housing Initiative Program (FHIP) grants. *See* Dkt. 21-1, Ammon Decl., ¶ 3 ("To the best of my knowledge, USDS has no authority to direct HUD or HUD officials to terminate grants or take any other actions on behalf of HUD."). Plaintiffs therefore believe that enjoining HUD and Scott Turner will adequately redress the irreparable harm they face, and they submit an amended proposed order as Exhibit 3 here. Plaintiffs will continue to pursue their *ultra vires* claim against DOGE arising from its past interference with their grants, and Plaintiffs reserve the right to seek interim relief if subsequent events indicate it is necessary to protect their interests.

## II. Controlling First Circuit Precedent Makes Clear That This Court Has Jurisdiction Over Plaintiffs' Claims.

On Friday, March 21, the First Circuit heard an appeal of a temporary restraining order that had been issued against the Department of Education, requiring it to reinstate grants it had terminated. *State of California, et al. v. United States Dep't of Educ., et al.*, No. 25-1244, 2025 WL 878431 (1st Cir., Mar. 21, 2025). That case controls here and disposes of Defendants' argument that this Court lacks jurisdiction over Plaintiffs' claims.

A. <u>Claims of Improper Termination of the Grants at Issue Fall Within the Waiver of Sovereign Immunity in the Administrative Procedure Act (APA).</u>

Defendants contend that Plaintiffs' claims about the grant terminations are contract suits delegated exclusively to the Court of Federal Claims by the Tucker Act, 28 U.S.C. § 1491(a), and not within the APA's waiver of sovereign immunity. In *State of California*, the First Circuit rejected this argument. There, Plaintiffs challenged the Department of Education's mid-stream termination of grants, effected through boilerplate termination letters to a subset of grant recipients, relying in part on nearly identical language to HUD's reasoning here, that the grants were "inconsistent with, and no longer effectuate[], Department priorities." *Id.* at *1.

The Court rejected Defendants' argument that because Plaintiffs sought to compel the Government to make payments under grants, their claims were for breach of contract damages and committed exclusively to the Court of Federal Claims. The Court first concluded that Plaintiffs' claims concerned Defendants' violations of the APA, rather than of the contract terms: "although the terms and conditions of each individual grant award are at issue, the 'essence'[] of the claims is not contractual"; instead, the plaintiffs "challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). The States' claims are, at their core, assertions that the Department acted in violation of federal law—not its contracts." *Id* at *2.

Next, the Court explained that the plaintiffs were not seeking compensatory damages, but an injunction requiring the reinstatement of the grant relationship. *Id.* While this injunction would compel the Department of Education to "once again make available already-appropriated federal funds for existing grant recipients," *id.*, the fact that the remedy included payment did not turn it into a compensatory damages case. *See id.* (citing *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)). This conclusion is supported by the statutory text of the APA, which defines "relief" by citation to 5 U.S.C. § 551, under which relief "includes the whole or a part of an agency . . . grant of money."

Here, as in *State of California*, Plaintiffs challenge HUD's failure to comply not with the grant contracts, but with the APA and the Fair Housing Act (FHA). The fact that the remedy, reinstatement of the grants, would involve payment does not change the fundamental nature of the action.

B. <u>These Terminations Are Not Part of the Narrow Category of Unreviewable Agency Decisions.</u>

As Defendants do here, the Department of Education contended in *State of California* that its grant terminations were discretionary decisions not subject to judicial review. *State of California*, 2025 WL 878431, at *3; *see also* Def. Opp., Dkt. 21, at 11-12 (Defendants' contention here that "[t]he Court cannot review HUD's discretionary decisions regarding how to allocate funds"). The First Circuit rejected that contention, finding that the Department of Education's grant decisions were not wholly discretionary, because the controlling regulations and statute constrain those decisions and so provide "meaningful standards by which to judge" them. *Id.* (quoting *Dep't of Comm. v. New York*, 588 U.S. 752, 772 (2019)) (alterations omitted).

Similar constraints govern HUD's conduct here: the primary regulation at issue in both cases is 2 C.F.R. § 200.340(a), the Office of Management and Budget regulation concerning grant termination. *See State of California*, 2025 WL 878431, at *3. Both there and here, the agencies have incorporated the standards from that regulation into their own grantmaking regulations. *See* 2 C.F.R. § 3474.1 (Department of Education regulation incorporating OMB standards); 24 C.F.R. § 84.1 (HUD regulation incorporating OMB standards for FHIP grants). And, in both cases, the statute directs the agency's conduct with respect to grantmaking. *See State of California*, 2025 WL 878431, at *3 (describing statute governing Department of Education grants); 42 U.S.C. § 3616a (outlining FHIP grant requirements). Indeed, the FHIP statute directs that the HUD secretary "shall use funds made available . . . to conduct, through contracts with private nonprofit fair housing enforcement organizations, a range of investigative and enforcement activities designed to" further FHA priorities, including "discover[ing] and remedy[ing] discrimination in the public and private real estate markets and real estate-related transactions." 42 U.S.C. § 3616a(b)(2)(B). HUD, like the Department of Education, cannot

"terminate a grant merely because a recipient program" carries out activities mandated by the statute, *State of California*, 2025 WL 878431, at *3, and the APA empowers the Court to determine whether it has done so.

### III.   The Grant Terminations Were Arbitrary and Capricious, as Ammon's Declaration Confirms.

The APA enables courts to set aside agency action that is arbitrary and capricious; that is, where, *inter alia*, it is not "reasonable," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); does not demonstrate "a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); is based on an explanation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *id.*; or that fails to consider the "serious reliance interests" a previous policy engendered, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). The declaration by acting HUD Deputy Secretary Matthew Ammon, and the circumstances of the canceled grants, demonstrate that the grant terminations were arbitrary and capricious by all these measures.

As an initial matter, "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) (citing *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)); *see also State of California*, 2025 WL 878431, at *4 (rejecting Chief of Staff's affidavit because the "newfound claim of clarity approaches the sort of 'post hoc rationalization' that we cannot allow"). For that reason, this Court should disregard Ammon's litigation declaration ("the Declaration"), which at best purports to offer a post-hac justification for the agency action. Even if the Court considers that

declaration, however, it merely confirms that the grant cancelations here were arbitrary and capricious.

A. <u>The Termination Rationale Is Not Reasonable, Does Not Reflect a Rational Connection Between the Facts Found and the Choice Made, and is Implausible.</u>

The explanations given for the terminations are classically arbitrary—the stated justification bears no rational relationship to the terminations themselves. The Declaration says that the grants were terminated because they "include language that specifically imposes DEI, DEIA, and/or 'equity' actions, initiatives, plans, programs, grants, contracts, performance requirements, or preferences . . . ." Ammon Decl., ¶ 7.

The Declaration does not explain what is meant by DEI, DEIA, or equity, but the DEI-related order it cites, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," refers to "illegal DEI and DEIA policies," which it defines as "dangerous, demeaning, and immoral race- and sex-based preferences." *See* Exec. Order 14173.

The Fair Housing Act, 42 U.S.C. § 3601, *et seq.*, which governs HUD and the grantees, prohibits discrimination on the basis of race and sex, including giving preferences on those bases. *See, e.g.*, 42 U.S.C. § 3604(a)-(e). It is thus unclear, and the Declaration does not explain, how the grants, which were made to further the non-discrimination purposes of the FHA, in fact promoted illegal race- and sex-based preferences.

Even a few sample grant documents confirm that the grantees were using the grants to carry out bread and butter fair housing work that promotes the non-discriminatory purposes of the FHA. The scope of work for Named Plaintiff Massachusetts Fair Housing Center (MFHC), for example, includes conducting intake and processing 600 complaints and litigating or referring complaints to HUD where meritorious. *See* Exhibit 1-B, Supplemental Decl. of M. St. Cyr. It includes conducting systemic tests to identify discrimination on the basis of race, national

origin, and sex, and it includes conducting fair housing education for housing providers and community groups. *Id.* These are the exact activities that the FHIP statute contemplates. *See* 42 U.S.C. § 3616a(b)(2), (d). MFHC's grant documents do not mention "diversity," "DEI," or "DEIA." Ex. 1, ¶ 11. They include the word "equity" in only two contexts: one is a sample conflict-of-interest policy HUD provided, which contains references to "equity securities," *id.*, ¶ 12, and the other is an executive order President Biden issued entitled "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government," *id.*, which was included in HUD's Attachment A document and comports with the direction in the FHIP statute to pursue enforcement activities in underserved areas, 42 U.S.C. § 3616a(b)(2), (c)(2). The interest the Declaration articulates, of prohibiting illegal race- and sex-based preferences, has no rational relationship to canceling this grant.

Similarly, the scope of work for Named Plaintiff Fair Housing Center of North Texas (FHCNT) describes core enforcement, education, and outreach activities to prevent or eliminate any discriminatory housing practices prohibited by the FHA. *See* Exhibit 2, Supplemental. Decl. of S. Tamez, Exhibit B. As described below, the application includes a narrative regarding racial equity that was mandatory at the time FHCNT submitted its application, Ex. 2, ¶ 13, and is wholly consistent with the FHA's requirements. The scope of work mentions "diversity" in only a single sentence when noting that, although there is a State fair housing enforcement body (a "FHAP"), "the sheer physical size *and diversity* of the State can present obstacles for the FHAP and it cannot sufficiently serve these underserved areas need for fair housing services in Texas." *See id.* ¶ 11 (emphasis added). It is utterly implausible that an acknowledgement of the state's

diversity could amount to an impermissible DEI purpose within the meaning of the executive orders.[1]

B. HUD Failed to Consider Grantees' Reliance Interests.

As detailed in the Complaint, the FHIP scheme was based on a congressional and agency understanding that fair housing organizations are critical to enforcement of the FHA and that there were few other funding sources for these organizations. Comp., Dkt. 1, ¶¶ 23-26. For decades, these organizations have applied for funding on one- to three-year cycles, and they have hired staff and planned their activities to conform to their grant obligations. They are paid on a quarterly basis, retrospectively, for work they have already completed. *See, e.g.*, Ex. 1-C. The organizations also cannot use FHIP funds to build up reserves; any funding they do not use for program purposes must be returned to HUD. *See, e.g.*, Attachment A to FHIP Grant Awards, Dkt. 5-2, Ex. 2-A, at 32 ("Excess Funds"). This lack of reserve funds means they cannot easily redirect funds from other sources to continue work already begun under the FHIP grants.

Against this backdrop, suddenly cutting off funding has obvious and catastrophic consequences for most grantees. There is no evidence in the Declaration that HUD took these reliance interests into account or in any way considered that immediately cutting off critical funding would deplete the fair housing enforcement infrastructure throughout the country.[2]

---

[1] Of course, the agency's decisions are bound by the FHA, and so the agency is empowered to take action in conformance with executive orders only to the extent those orders comply with the statutory mandate. *See New York v. Trump*, No. 25-cv-39, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025). Plaintiffs do not concede that the Executive Orders cited in the Declaration are fully lawful.

[2] As discussed in the first St. Cyr Declaration, MFHC has limited reserves, has already had to make cuts to programming and staff, and could be forced to close altogether. Dkt. 3-2 at ¶¶ 40-42, 49. Because of these cuts, it has been forced to decline services for individuals including a domestic violence survivor who was at risk of displacement from a shelter and an individual who was denied an apartment because of her status as a person in recovery. Dkt. 3-2 at ¶¶ 43-44.

Moreover, it appears from the Declaration that organizations such as FHCST were targeted for grant terminations *because* they adhered to HUD's earlier express requirements for grant applications. As noted above, when FHCST applied, HUD required that applicants include in grant applications a narrative regarding racial equity. HUD said at the time, "if the Narrative is not included or is insufficient it will be deemed a curable deficiency[.]"Ex. 2-E, ¶ 13; *see also* Ex. 1, ¶ 8 (describing similar reliance in adding certain activities to its Statement of Work). FHCST's grant documents accordingly included a document entitled "the Advancing Racial Equity Narrative." *See* Ex. 2-E. Now, the Declaration suggests that Defendants focused exclusively the existence of certain words or phrases in the grant documents, regardless of context, and terminated grants on the basis of those words without consideration of Plaintiffs' substantial reliance interests. The Named Plaintiffs reasonably relied on the validity of HUD's grant requirements, and they were then punished for that reliance, with no explanation for the change.

Dated: March 24, 2025

Respectfully submitted,
*/s/ Lila Miller*
Lila Miller*
Reed Colfax*
Zoila Hinson*
Rebecca Livengood*
Yiyang Wu*
Robert Hunter*
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
Tel: (202)728-1888
Fax: (202)728-0848
rlivengood@relmanlaw.com
rcolfax@relmanlaw.com
zhinson@relmanlaw.com
lmiller@relmanlaw.com
ywu@relmanlaw.com

rhunter@relmanlaw.com

Daniel Ordorica (BBO # 705729)
HEISLER, FELDMAN, & ORDORICA, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
Tel: (413)788-7988
Fax: (413)788-7996
dordorica@hfmgpc.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*