# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS FAIR HOUSING CENTER; INTERMOUNTAIN FAIR HOUSING COUNCIL; SAN ANTONIO FAIR HOUSING COUNCIL, INC., d/b/a FAIR HOUSING COUNCIL OF SOUTH TEXAS; and HOUSING RESEARCH AND ADVOCACY CENTER, d/b/a FAIR HOUSING CENTER FOR RIGHTS & RESEARCH, INC., *on behalf of themselves and all those similarly situated*,<br><br>        Plaintiffs,<br><br>v.<br><br>THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, *in his official capacity as Secretary of Housing and Urban Development*; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; and AMY GLEASON, *in her official capacity as Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization*,<br><br>        Defendants. | Case No. 3:25-cv-30041-RGS<br><br>**REQUEST FOR ORAL ARGUMENT** |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND STAY PROCEEDINGS**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

INTRODUCTION ....................................................................................................... 1

    I.    Factual and Legal Background ................................................................. 2

    II.    Legal Standard ......................................................................................... 3

    III.    The *California* Order Does Not Support Dissolving the TRO in this Case. ................. 4

        A.    Plaintiffs Face Irreparable Harm Without a TRO. ............................... 5

        B.    Plaintiffs' APA Claims Are Not Based on Any Contract. ................... 7

    IV.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims. ................. 9

        A.    Plaintiffs' Claims Derive from the APA, Not a Contract. ................... 11

        B.    Plaintiffs Seek Prospective Equitable Relief, Not Money Damages. ............... 13

    V.    A Stay Is Not Appropriate. ..................................................................... 18

CONCLUSION ......................................................................................................... 18

REQUEST FOR ORAL ARGUMENT ...................................................................... 19

## INTRODUCTION

Currently in place is a Temporary Restraining Order ("TRO") lasting a little over a month, until May 16. Defendants seek to dissolve the TRO and stay proceedings on the basis of two paragraphs of discussion in a per curiam order from the Supreme Court in *Department of Education v. California*, 604 U.S. --- (Apr. 4, 2025) (No. 24A910), 2025 WL 1008354 at *1 (hereinafter "the *California* Order"). That interim ruling does not justify dissolving the TRO in this case. To begin, the Supreme Court did not issue a final decision on jurisdiction, even for that case. The Order is thus of limited utility, both because it does not contain a meaningful analysis and because it does not receive the same precedential value as a full opinion. In addition, material distinctions can be found even in the narrow span of those two short paragraphs. The *California* Order determined that the risk of harm to the States in that case was not irreparable, but the Plaintiffs in this case do face exactly the type of irreversible injury that the Court found lacking there. Meanwhile, although the States' claims in *California* derived directly from the terms of the grant agreements at issue, the Plaintiffs' claims in this case derive exclusively from federal statute, and so the suit here is not "based on 'any express or implied contract with the United States.'" *California* Order at 2 (quoting 28 U.S.C. 1491(a)(1)). In other words, the *California* Order should not displace this Court's entry of a TRO.

The TRO is proper now just as it was when this Court issued it—Plaintiffs' allegations and evidence demonstrate that this Court has jurisdiction over Plaintiffs' claim against HUD, which is properly asserted under the Administrative Procedures Act ("APA"). Nor is there cause to stay proceedings to wait for further proceedings in *California*, since such proceedings are likely not forthcoming[1] and this case is materially different in any event. The Court should

---

[1] The States have now withdrawn their request for preliminary relief. *See Infra* Section V.

therefore deny Defendants' Motion to Dissolve the TRO and Stay Proceedings, ECF 37 ("Mot."), and maintain the TRO while the Parties brief Plaintiffs' forthcoming request for a preliminary injunction, ECF 36 (extending TRO through May 16).

## I.    Factual and Legal Background.[2]

Plaintiffs are a class of 66 non-profit fair housing groups that receive and rely on federal funding in the form of Fair Housing Initiatives Program ("FHIP") grants, which are awarded and administered by Defendant Department of Housing and Urban Development ("HUD").[3] Congress amended the Fair Housing Act ("FHA") to mandate the award of FHIP grants whenever Congress appropriates money for that purpose, which Congress has done every year since 1992. Plaintiffs use FHIP awards for statutorily enumerated activities, such as fair housing testing, investigations, education, and outreach. FHIP grants are the lifeblood of Plaintiffs' operations and make up a substantial portion of their annual budgets.

On February 27, all Plaintiffs received identical letters from HUD terminating certain FHIP awards "at the direction of DOGE" because the awards purportedly "no longer effectuate[d] program goals and agency priorities." *See, e.g.*, ECF 52-2 at 83 (Plaintiff MFHC's Termination Notice). The termination of their FHIP awards immediately inflicted harm on Plaintiffs, who were forced to lay off staff members, turn away clients, stop work on behalf of existing clients, halt programs, cancel events, hold back previously planned public outreach, break leases, and assess how long they could operate prior to complete closure.

---

[2] Unless noted otherwise, the following facts are drawn from Plaintiffs' Motion for a Temporary Restraining Order and the supporting materials, which Plaintiffs hereby incorporate by reference.

[3] Plaintiffs use "HUD" to refer to Defendants HUD and Turner. Plaintiffs use "DOGE" to refer to Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, and Gleason.

Plaintiffs initiated this action on March 13, asserting an APA claim against HUD and an *ultra vires* claim against DOGE. ECF 1. Plaintiffs filed an Emergency Motion for a TRO at the same time as their Complaint. ECF 4. Defendants filed an opposition brief on March 21, ECF 21, and Plaintiffs filed a reply on March 24, ECF 29. Also on March 21, the First Circuit issued an opinion denying the Department of Education's request for a stay of the District Court's TRO in the *California* case. *See California v. Dep't. of Educ.*, --- F.4th --- (1st Cir. Mar. 21, 2025) (No. 25-1244), 2025 WL 878431, at *1. That opinion analyzed and rejected many of the same arguments made by HUD in opposition to Plaintiffs' Motion for a TRO. *Id.* This Court held a hearing on March 25 and, consistent with the First Circuit's analysis, granted a TRO, ordering HUD to reinstate Plaintiffs' grants. ECF 31. The Parties subsequently agreed to extend the TRO until May 16 and to brief Plaintiffs' motion for a preliminary injunction in the interim. ECF 36.

The Supreme Court stayed the TRO in the *California* case in an unsigned per curiam order on April 4. The Order briefly addressed the District Court's jurisdiction as well as the States' recitation of irreparable harm. 2025 WL 1008354 at *1. Defendants now contend that this interim result mandates complete dissolution of the TRO in this case, as well as a stay of proceedings. For the reasons set forth below, Defendants are wrong.

## II.    Legal Standard

In evaluating TROs, either in the first instance or upon a motion to stay, courts look at the familiar four factors: likelihood of success on the merits, risk of irreparable harm, balance of the equities, and public interest. *See, e.g.*, *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (to obtain a TRO, a plaintiff must show a likelihood of success on the merits and irreparable harm absent relief); *Does 1-3 v. Mills*, 39 F.4th 20, 24 (1st Cir. 2022) (to stay a TRO, a defendant must make a "strong showing" that it will likely succeed on

merits and be irreparably injured absent a stay). Defendants' Motion challenges whether Plaintiffs remain likely to succeed on the merits of their APA claim and whether the balance of the harms continues to favor the Plaintiffs. On this record, Defendants cannot make the strong showing necessary to displace the TRO.

III.    **The *California* Order Does Not Support Dissolving the TRO in this Case.**

The Supreme Court's ruling in *California* does not undermine the propriety of a TRO here. As a threshold matter, the *California* Order is not a final ruling on the merits and receives "considerably less precedential value than an opinion on the merits." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180-81 (1979). *See also Labrador v. Poe*, 144 S. Ct. 921, 928-929 (2024) (Kavanaugh, J., concurring in the grant of a stay) (distinguishing a ruling on an emergency stay application from "a final merits ruling"). This limitation makes sense: Because the ordinary explication and analysis does not appear in a summary order, there is little to be gleaned in terms of general applicability. For example, the Supreme Court did not explain, beyond conclusory statements, why the District Court in the *California* case may lack jurisdiction. It is unsurprising, then, that the First Circuit has already declined to stay preliminary relief in a different matter, notwithstanding the *California* Order. *D.V.D. v. Dep't of Homeland Sec.*, No. 25-1311, 2025 WL 1029774, at *1 (1st Cir. Apr. 7, 2025) (finding that a TRO was not immediately appealable even though the *California* Order reached the opposite conclusion). The outcome of the *California* Order, without more, does not reflexively entitle Defendants to the reversal they now seek.

Rather, the availability of preliminary relief "is dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009). Two key differences set this case apart from the facts and circumstances animating the *California* Order and limit the Order's

applicability here. First, unlike the States in *California*, Plaintiffs face imminent and irreparable

harm if the TRO is dissolved or stayed. Second, unlike the States, Plaintiffs do not rely on the

terms and conditions of their grant agreements to support their APA claim, and this case therefore

is not a suit based on a contract with the United States.

      A.    <u>Plaintiffs Face Irreparable Harm Without a TRO.</u>

      The risk of harm to Plaintiffs if the TRO is stayed or dissolved is categorically distinct

from and far greater than the potential injuries presented to the Supreme Court in *California*. The

States were not direct grant recipients, and they did not argue that staying the TRO would end

the teacher placement partnerships or professional development programs. Rather, the States said

that they would make up for the lost federal funding with their own resources and keep the

programs going. Brief for Respondent at 20, *California v. Dep't. of Educ.*, --- F.4th --- (1st Cir.

Mar. 21, 2025) (No. 25-1244), 2025 WL 878431, at *1 (arguing that States' "own institutions

would be required to expend public funds"). A narrow majority of the Supreme Court concluded

that this was insufficient to show irreparable harm:

> Respondents have represented in this litigation that they have the financial
> wherewithal to keep their programs running. So, if respondents ultimately prevail,
> they can recover any wrongfully withheld funds through suit in an appropriate
> forum. And if respondents instead decline to keep the programs operating, then
> any ensuing irreparable harm would be of their own making. Such self-imposed
> costs are not properly the subject of inquiry on a motion for stay.

2025 WL 1008354, at * 1 (citation and internal quotation marks omitted).

      Plaintiffs, as direct grant recipients with limited resources, face circumstances that are far

more dire. Plaintiffs cannot "keep their programs running" without their FHIP grants; even a

temporary pause will force them to terminate FHIP activities, if not shutter entirely. ECF 5 at 15-

18 (describing the irreparable injuries Plaintiffs experienced as a result of the February 27

termination). Worse yet, the harm radiates beyond the specific programs encompassed by

Plaintiffs' FHIP awards—the temporary loss of funding between the February 27 termination and the March 26 TRO forced Plaintiffs to lay off staff, turn away clients, break leases, cancel events, and map out how long they could survive. *Id.* This is precisely the kind of harm that courts deem to be irreparable in the context of organizational plaintiffs. *Id.* at 17-18 (citing, e.g., *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (irreparable harm from impairment of programs and frustration of mission)). This is because, unlike the States, Plaintiffs have no stopgap funding whatsoever, and certainly not the necessary "financial wherewithal" to survive long enough to recoup lost funds at the end of the case or in a different forum. *Id.* at 17 (describing budgeting chaos and existential threat created by FHIP grant termination). As shoestring non-profits, many of which were established with and around FHIP grants, Plaintiffs simply cannot absorb the cost. ECF 5-1 (Decl. of L. Rice) (describing financial precarity of Plaintiffs); ECF 5-2, ¶ 17 (MFHC's annual budget is less than $900,000); ECF 5-4, ¶ 16 (Fair Housing Center of South Texas's annual budget is $500,000).).

This sets Plaintiffs apart from the States in *California*, who did not actually receive the grants at issue. Rather, the States created their own financial injuries by covering lost federal funding such that the harm was "of their own making." Plaintiffs here are the actual grantees, and their injuries stem directly from HUD's grant terminations.[4] Plaintiffs have thus shown what the Supreme Court found materially lacking in *California*: certain, imminent, direct, and irreparable harm if the TRO is displaced.

---

[4] Plaintiffs here are also distinct from the plaintiff-states who challenged the firing of federal employees despite not being party to the employer/employee relationship, and the Fourth Circuit's recent order in that case has no bearing here. *Maryland v. U.S. Dep't of Agriculture*, Nos. 25-1248 and 25-1338, 1073657, at *1 (Apr. 9, 2025) (staying injunction in just a few cursory sentences on the four injunction factors).

Notably, HUD's opposition to Plaintiffs' TRO motion did not even attempt to refute Plaintiffs' showing of harm. ECF 21. Instead, HUD asserts that these injuries are outweighed by the risk that the agency will not recoup FHIP funds used while the TRO is in place even if HUD ultimately succeeds on the merits. Mot. at 2-3. But using Congressionally appropriated funds for their Congressionally mandated purposes is not an injury, especially given that the applicable regulations prevent HUD from permitting the use of FHIP funds for anything else, something the Supreme Court did not address. *See, e.g.*, *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621, at *16 (D.R.I. Mar. 6, 2025); 2 C.F.R. 200.308(i). It would be anomalous to call run-of-the-mill compliance with the FHIP statute and OMB regulations an injury under any circumstances, but it is particularly unpersuasive here. Leaving the TRO in place means another month of the very fair housing work that Congress contemplated when enacting the FHIP provision, an interval that is significant not only because of the essential services that Plaintiffs will provide to their communities but also because of how little time Plaintiffs will have left without their FHIP awards. ECF 5-2 ¶ 49 (MFHC faces closure in eight months); ECF 5-3 ¶ 48 (IFHC faces closure in six months); ECF 5-4 (FHCST faces closure in six months).

B.     Plaintiffs' APA Claims Are Not Based on Any Contract.

The States in *California* tethered their APA claims to the terms and conditions of their grant agreements. This linkage meant that resolving the States' claims necessarily would have resembled enforcing a contract, a matter that the Supreme Court said would likely be found to be reserved for the Court of Claims pursuant to the Tucker Act. Here, by contrast, Plaintiffs' APA claim can be resolved without even looking at their grant documents, which renders the Tucker Act inapplicable. *See Infra* Section IV (explaining further why Plaintiffs' claims are properly asserted under the APA in this forum).

The *California* Order noted that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" 2025 WL 1008354, at * 1 (citing 28 U. S. C. §1491(a)(1)). This issue arose because the States consistently relied on and referred to the language in their grants to plead and support their APA claim. The States' initial pleading alleged that "the terms and conditions of the TQP and SEED grant awards do not authorize termination on the[] grounds" invoked by the Department of Education. *California v. Dep't of Educ.*, No. 1:25-cv-10548, ECF No. 1 ¶ 14 (D. Mass. Mar. 6, 2025); *see also, e.g., id.* ¶ 131 ("Further, the terms and conditions of the relevant grant awards do not authorize termination of a grant based on failure to effectuate agency priorities."); ¶ 183 ("Here, the terms and conditions of the TQP and SEED grant awards generally authorize termination by Defendants only for material failure to comply with the award terms or for engaging in violations of human trafficking. No term or condition for any TQP or SEED grant award authorizes termination for failure to effectuate agency priorities."). The States pursued this theory at all levels of litigation: In their stay opposition before the Supreme Court, the States argued that "[D]efendants have not identified any term or condition of any TQP or SEED award that would authorize termination on the grounds they have asserted." Brief for Respondent at 23, *Dep't. of Educ. v. California*, 604 U.S. --- (Apr. 4, 2025) (No. 24A910), 2025 WL 1008354. The States premised their APA claims on the provisions in the grant agreements themselves, making it impossible to evaluate their claims without construing terms and conditions in the grant agreements, much like evaluating a contract with the United States.

Not so here. Plaintiffs do not argue that HUD's action was inconsistent with the terms and conditions of their awards; they argue that HUD's action was inconsistent with federal law. This Court need not look at Plaintiffs' grant agreements to assess their claims. For that reason,

Plaintiffs did not analyze the term or conditions of their grant agreements when explaining why Defendants' action violated the APA. ECF 5 at 9-13 (referring to one grant document for limited purpose of showing overlap between Plaintiffs' activities and the statutory text of the FHIP provision). Because Plaintiffs' claims construe the APA, the FHA, and the applicable regulations, not a contract with the United States, the Tucker Act is not implicated. *Infra* Section IV.A.

Defendants' citation to *Taunton Gardens Co. v. Hills*, 557 F.2d 877, 878 (1st Cir. 1977), does not change this analysis. Mot. at 3. That was one of many cases where different courts were contending with duplicative claims arising from a newly created HUD subsidy fund for affordable housing. A district court entered an injunction that would have disrupted the status quo by requiring payment from the subsidy fund, *Underwood v. Hills*, 414 F. Supp. 526 (D.D.C. 1976), and the Supreme Court stayed the injunction to maintain the status quo while the various cases played out, *Hills v. Underwood*, 429 U.S. 892 (1976). None of these unusual conditions are present here, nor is there a risk of overlapping litigation because Plaintiffs in this case challenge a different grant program by a different agency.

***In sum***, because Plaintiffs' injuries and APA claim are fundamentally distinct, this Court is not required to dissolve the TRO merely because of the *California* Order. This Court must instead undertake a fact- and circumstance-specific assessment of jurisdiction in this case. *See Nken*, 556 U.S. at 433. For the reasons set forth below, such an assessment shows that Plaintiffs properly asserted an APA claim in this forum.

## IV.    This Court Has Subject Matter Jurisdiction Over Plaintiffs' APA Claims.

The federal government has waived sovereign immunity for APA claims "seeking relief other than money damages." 5 U.S.C. § 702. The APA in turn defines "relief" as including "the whole or a part of an agency . . . grant of money [or] assistance." 5 U.S.C. § 551(11). Plaintiffs'

request for an injunction that preserves the grantor/grantee relationship—an injunction that preserves the agency's grant of money prior to the unlawful termination decision—thus falls squarely within the APA's waiver of sovereign immunity.

While the plain text of the APA should be the end of this inquiry, Defendants argue that the Tucker Act requires this action to be heard in the Court of Federal Claims. Mot. at 1-2. The Tucker Act vests exclusive jurisdiction in the Court of Federal Claims over any claim against the United States that is based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). That statute has no purchase here because Plaintiffs neither allege a contract breach nor seek a contractual remedy; they merely seek judicial review of agency action to facilitate relief explicitly authorized by the APA.

To assess whether a suit belongs in the Court of Claims under the Tucker Act, courts in the First Circuit have looked to the factors set forth in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.C. 1982). *See Massachusetts v. Nat'l Insts. of Health*, --- F. Supp. 3d ---, 2025 WL 702163, at *6-7 (D. Mass. Mar. 5, 2025). Under *Megapulse*, courts assess whether the "essence" of an action is one in contract, an inquiry that requires consideration of "the source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)." 672 F.2d at 968. Courts have acknowledged for over forty years that "contract issues may arise in various types of cases where the action itself is not founded on a contract," and therefore a district court may address and resolve collateral contract issues without infringing on the Court of Claims' jurisdiction. *Nat'l Insts. of Health*, 2025 WL 702163, at *6 (quoting *Megapulse*, 672 F.2d at 968). In particular, federal courts have jurisdiction over "disputes arising from contractual relationships . . . where the government defendants are charged with having acted beyond the scope of their statutory authority." *Megapulse*, 672 F.2d at 968, 968 n.46 (citing cases). The

critical question, then, is not whether a contract is involved, but whether "the claim so clearly presents a disguised contract action that jurisdiction over the matter is properly limited to the Court of Claims." *Id.* at 968. Because this case starts and ends with APA review of HUD's February 27 termination and its inconsistency with the statutory framework, both *Megapulse* considerations weigh in favor of jurisdiction here.

    A.    <u>Plaintiffs' Claims Derive from the APA, Not a Contract.</u>

Plaintiffs' claims address the extent and propriety of HUD's decision-making under the APA. These issues simply do not sound in contract. The only misconduct alleged by Plaintiffs against HUD is that the termination decision violated the APA because it was arbitrary, capricious, and contrary to law by terminating Plaintiffs' grants with an inadequate, implausible, and unreasonable explanation.[5] If Plaintiffs are entitled to the reinstatement of their grant agreements, it is because of this APA violation, not because of any allegations of breach or issue of contract interpretation.

As an initial matter, federal law confirms that Plaintiffs' awards are distinct from contracts. Congress instructed agencies to use grants when "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose" (as is the case with FHIP) and to use "procurement contracts," when "the principal purpose of the relationship is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States" (as is not the case with FHIP). 31 U.S.C. §§ 6303-04. Even assuming *arguendo* that Plaintiffs' FHIP awards were to qualify as contracts, that would not automatically convert their claims into Tucker Act claims. Plaintiffs do

---

[5] Again, this APA framing differs from the States' claim in *California*. *See Supra* Section III.

not allege that the government has breached any term or condition of the grant agreements, nor

has HUD alleged that any Plaintiffs breached any portion of the agreements.

When a Plaintiff's claim stems from APA violations rather than the terms of a grant

agreement, the claim does not "sound in contract" for Tucker Act purposes. *See, e.g.*, *Normandy*

*Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009)

(noting that even though the plaintiff could not assert a claim absent a "[c]ontract with HUD,"

this predicate did not convert a claim asserting rights based on federal regulations into one which

is, "at its essence," a contract claim.")[6]; *AIDS Vaccine Advocacy Coalition v. U.S. Dep't of State*,

--- F. Supp. 3d. --- , 2015 WL 752378, at *9 (D.D.C. Mar. 10, 2025) ("[I]t would be quite

extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all

depend on whether the terms of particular awards were breached—they instead challenge

whether the agency action here was unlawful, irrespective of any breach.").

Plaintiffs' claims are not transformed into contract claims by HUD's belated explanation,

proffered in the Ammon Declaration, that HUD terminated FHIP grants containing DEI-related

language or activities. *See* ECF 21-1. That explanation should be disregarded as a post-hoc

justification. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419–20 (1971) (holding

that judicial review is inappropriate when it would rely on explanations found in the agency's

litigation affidavits). Even if the Court were to credit the Ammon Declaration, it does not speak

to Plaintiffs' separate basis for challenging the February 27 termination decision: Plaintiffs also

argue that, regardless of HUD's explanation, the agency acted contrary to law because cancelling

Plaintiffs' grants countermands Congressional intent as expressed in the FHA and in

---

[6] In *Normandy*, the Court found that an apartment developer's APA claim that HUD failed to
follow its own regulations in terminating a contract for Section 8 subsidies was not contractual in
nature because the "essence" of the claim was regulatory. 554 F.3d at 1299-1300.

Congressional appropriations. ECF 5 at 13. HUD's explanation does not bear on this aspect of the APA analysis, further confirming that this case does not turn on the grant documents.

    B.    <u>Plaintiffs Seek Prospective Equitable Relief, Not Money Damages.</u>

Plaintiffs also do not "essentially" seek damages for breach of contract; they seek equitable relief to reestablish the grantor/grantee relationship, including the procedures and obligations appurtenant thereto. More specifically, grant reinstatement will impose on Plaintiffs the obligations to undertake and achieve certain deliverables and report on those deliverables to HUD. *See* Ex. 1 (Decl. of M. St. Cyr). HUD will then review Plaintiffs' reporting and performance and disburse funds as appliable. *Id.* This process will continue for the life of the grant. *Id.* At no point are Plaintiffs entitled to simply invoice HUD and expect remuneration, *id.*, nor would grant reinstatement necessarily result in a Court order to immediately pay a specific sum of money. Under these circumstances, a court order to resume business as usual plainly constitutes forward-looking equitable relief, not money damages, under both the text of the APA and governing precedent. The *California* Order does not indicate otherwise.

***First***, the text, structure, and legislative history of the APA demonstrate that the waiver of sovereign immunity in 5 U.S.C. § 702 was intended to encompass an order reinstating a grantor/grantee relationship. When Congress amended § 702 in 1976 to permit suits for "relief" other than "money damages," the APA already defined "relief" to include "the whole or a part of an agency . . . grant of money [or] assistance". *See* 5 U.S.C. § 551(11). If Congress intended its exclusion of "money damages" from § 702 to restrict relief in the form of "an agency grant of money or assistance," one would expect Congress to say so explicitly. It did the opposite.

In fact, the legislative history confirms that Congress did not intend, in excluding "money damages" claims from the APA, to bar claims for specific reinstatement of a grant agreement.

First, as the Court in *Bowen v. Massachusetts* observed, at the time of the 1976 amendment the term "money damages" typically referred to "a sum of money used as compensatory relief," as opposed to "specific relief," which referred to "an attempt to give the plaintiff the very thing to which he was entitled." 487 U.S. 879, 895 (1988) (quoting *Md. Dep't of Human Resources v. Dep't of Health & Human Servs.*, 763 F.2d 1441, 1446 (D.C.C. 1985)). This distinction is reinforced in the language of the House Report accompanying the amendment, which explicitly contrasted actions for "specific relief" (authorized by § 702) from "the recovery of money damages" which it acknowledged must be brought "pursuant to the Tucker Act." H.R. Rep. No. 94-166, at *9.[7] Moreover, the House Report explicitly cited the "administration of Federal grant-in-aid programs" as a type of case for which the new provision would *permit* judicial review in district courts—an assertion that would be illogical if Congress believed that any order resulting in the reinstatement of federal grant funds constituted "money damages." *See* H.R. Rep. No. 94-166, at *9. Thus, the phrase "relief other than money damages" as used in § 702 has always encompassed the reinstatement of an agency grant of money or assistance.[8]

---

[7] As the Court in *Bowen* made clear, it was well-understood at the time that "specific relief" could take the form of an equitable order to perform on an agreement that included payment of money unlawfully withheld. *Id.* (citing contemporaneous cases). Congress is presumed to be familiar with the state of the law when it legislates. *See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–697 (1979).

[8] Other courts have relied on the distinction between compensatory money damages and specific relief in affirming the jurisdiction of district courts to set aside unlawful agency actions that effectively terminate or change ongoing grantor/grantee relationships. *See, e.g.*, *Nat'l Insts. of Health*, 2025 WL 702163, at *6-7 (noting that Plaintiffs' challenge to a rate-change notice impacting grant reimbursement does not seek "claims for past pecuniary harms" but was brought to preserve [Plaintiffs'] ongoing and prospective [grant] agreements"); *AIDS Vaccine Advoc. Coalition*, 2015 WL 752378, at *8-9 ("Plaintiffs are not seeking compensation for their losses due to the failure to pay them, which, as in any contract case, could be far greater than the amount withheld pursuant to the agency policy; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it.").

**Second**, because Plaintiffs seek to reestablish the grantor/grantee relationship, not money past due on a contract, their claims are controlled by *Bowen*, 487 U.S. 879, not by *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002).

In *Bowen*, the Supreme Court considered whether the Court of Claims had exclusive jurisdiction over a challenge to the Federal Government's refusal to reimburse certain Medicare expenditures. 487 U.S. at 882. Similar to the FHIP grants at issue here, the federal government's "reimbursement" to the states under the Medicaid program took the form of quarterly advance payments based on a state's estimates of its work. *Id.* at 883-4. These estimates were subject to adjustment based on work performed, and disputed funds could be "disallowed" and withheld by the federal government or held by the state pending resolution of the dispute. *Id.* at 883-4. Massachusetts sought review of the federal government's decision to disallow the reimbursement of certain funds. *Id.* The Supreme Court held that the Tucker Act did not provide plaintiffs with an adequate remedy for this challenge because the sought-after relief included an injunction to set aside the disallowance decision, which was also prospective in nature and thus beyond what the Court of Claims could offer. *Id.* at 905. The Court explained that the reversal (or grant) of a Medicaid disallowance is prospective because it necessarily impacts what expenses will or will not qualify for reimbursement moving forward, which in turn affects a state's budgeting, expectations of future funds, and the "ongoing relationship" between the federal government (the grantor) and state (the grantee). *Id.* at 907.[9] In other words, setting aside a disallowance determination may affect both a state's entitlement to funds past due *and* the work that will qualify for reimbursement in the future. For this reason, the Court acknowledged that, where the

---

[9] The Court characterized an allowance as "an adjustment . . . in the size of the federal grant to the state that is payable in huge quarterly installments," *id.* at 893, like the quarterly reporting and payment approvals for FHIP grants, *see* Ex. 1.

availability of reimbursement for grant-related work is at stake, "it [may be] important to seek judicial review—perhaps in the form of a preliminary injunction—as promptly as possible after the agency action becomes final." *Id.* at 907.[10] The Court thus held that Massachusetts properly sought equitable prospective relief under the APA in district court.

In contrast, the Petitioner in *Great-West Life & Annuity Ins. Co. v. Knudson* was an insurance company that sought reimbursement of money it had *already paid* on behalf of an individual for medical expenses following that individual's recovery of a personal injury settlement. 534 U.S. 204, 207 (2002). It was undisputed that the money alleged to be owed was money "past due" under the contract: the medical expenses had already been paid for and the Court mentioned no ongoing obligations between the parties (and certainly no ongoing grantor/grantee relationship). On this basis, the Supreme Court found that the relief sought was legal, not equitable in nature, and thus not recoverable under ERISA. *Id.* at 211-212. The *Knudson* court distinguished *Bowen* on the basis that *Bowen* involved prospective injunctive relief, which would not apply to a case that dealt with the *exclusively* past due funds at issue in the insurance contract. *Id.* at 212. But to hold that the naked recovery of past due funds is legal relief is quite different from holding that *any* transfer of past due sums automatically converts a claim into one for "money damages," as Defendants now argue. The Court in *Knudson* said so

---

[10] The Court also noted that it was important for district courts to retain jurisdiction over claims where it was uncertain on a given factual record whether or not the relief would be prospective in nature. *See id.* at 907 n.43. ("[W]hether injunctive or declaratory relief is appropriate in a given case will not always be apparent at the outset. Since, as a *category of case*, alleged 'improper Medicaid disallowances' cannot always be adequately remedied in the Claims Court, as a jurisdictional, or threshold matter, these actions should proceed in the district court. Then, the district court judge can award proper relief.") (emphasis in original).

itself: it emphasized that, unlike the private insurance dispute at hand, *Bowen* turned on "what Congress meant by 'other than money damages' in the [APA]." *Id.* at 212 (cleaned up).

The upshot is that, based on the distinctions the Supreme Court itself drew between *Bowen* and *Knudson*, Plaintiffs' claims more closely resemble *Bowen.* Plaintiffs, as in *Bowen*, do not seek "money damages" under the APA; they seek equitable prospective relief. 487 U.S. at 905-07. And the specific relief Plaintiffs seek is not "merely for past due sums"—they seek to reestablish their ongoing relationships with HUD. Indeed, this is the primary purpose of their injunction request: to provide a pathway for their essential work enforcing the FHA.

***Third***, the *California* Order does not change this straightforward application of statutory text and binding precedent. On the former, the States did not raise, and the Supreme Court did not consider, the clear textual basis for finding grant terminations reviewable under the APA.[11] On the latter, the Order explicitly acknowledged that, under *Bowen*, "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," 2025 WL 1008354, at *1 (quoting *Bowen*, 487 U.S. at 910). Moreover, here, too, the State's third-party status is important. The States were not party to the grantor/grantee relationship, and they did not argue that their requested relief would have reimposed mutual obligations on themselves and the Department of Education. Instead, the relief as it applied to the States was strictly financial.[12]

---

[11] The States raised neither the federal definition of a grant nor the APA definition of relief.

[12] Neither is *United States Conference of Catholic Bishops v. U.S. Dep't of State* instructive. --- F. Supp. 3d ---, 2025 WL 763738 (D.D.C. Mar. 11, 2025). That decision relied on two pre-*Bowen* decisions from the D.C. Circuit, neither of which related to grant awards. *Id.* *5-6 (discussing *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) and *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985)).

*In sum*, the facts and circumstances in this case confirm that Plaintiffs' claim against HUD is not, in essence, a contract claim. The source of the right is federal statute, not a contract, and the relief sought is equitable in nature, not money damages. This Court has subject matter jurisdiction, and Plaintiffs' APA claim against HUD may proceed.

## V.    A Stay Is Not Appropriate.

Defendants requested a stay pending the merits of the appeal in the *California* case. Mot. at 3-4. In between Defendants' Motion and this opposition, the States in *California* withdrew their request for a preliminary injunction, and the TRO that was stayed on April 4 independently expired on April 7. *California v. Dep't. of Educ.*, No. 1:25-cv-10548, ECF Nos. 79 and 89 (D. Mass. Mar. 6, 2025). The First Circuit proceedings have also been held in abeyance. *California v. Dep't. of Educ.*, No. 25-1244 (1st Cir.), Mar. 28 Order. Accordingly, at this time, there are no ongoing proceedings in that case that could inform preliminary relief here, and Defendants' request for a stay is moot.

A stay would have been inappropriate at any rate, for two reasons that remain relevant. First, Plaintiffs separately bring an *ultra vires* claim against DOGE for declaratory and injunctive relief. Defendants have made no jurisdictional arguments on this claim, nor could they. Thus, this case will remain in this forum irrespective of the disposition of Plaintiffs' APA claim. Second, a stay would have wrongly delayed production of the administrative record, which will ultimately be necessary to resolve both of Plaintiffs' claims, regardless of the forum.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion and maintain the TRO pending the preliminary injunction briefing, consistent with the Court's April 1 Electronic Order, ECF 36.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs believe that oral argument may assist the Court in deciding this motion and respectfully request to be heard.

Dated: April 11, 2025                                   Respectfully submitted,

_/s/ Lila Miller_
Lila Miller*
Reed Colfax*
Zoila Hinson*
Rebecca Livengood*
Yiyang Wu*
Robert Hunter*
RELMAN COLFAX PLLC
1225 19th Street, N.W., Suite 600
Washington, D.C. 20036
Tel: (202)728-1888
Fax: (202)728-0848
rlivengood@relmanlaw.com
rcolfax@relmanlaw.com
zhinson@relmanlaw.com
lmiller@relmanlaw.com
ywu@relmanlaw.com
rhunter@relmanlaw.com

Daniel Ordorica (BBO # 705729)
HEISLER, FELDMAN, & ORDORICA, P.C.
293 Bridge Street, Suite 322
Springfield, MA 01103
Tel: (413)788-7988
Fax: (413)788-7996
dordorica@hfmgpc.com

_* Admitted pro hac vice_

_Counsel for Plaintiffs_

19

**CERTIFICATE OF SERVICE**

      I, Lila Miller, hereby certify that that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing to be served upon counsel of record by email.


Dated: April 11, 2025                   */s/ Lila Miller*
                                       Lila Miller